J-A04026-14

2014 PA Super 207

| NANCY M. LENAU AND DANIEL T. LENAU AND KATHLEEN TRIESCHOCK ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellants | |
| v. | |
| CO-EXPRISE, INC. | |
| Appellee | No. 780 WDA 2013 |

Appeal from the Order of May 1, 2013
In the Court of Common Pleas of Allegheny County
Civil Division at No.: GD 12-022218

BEFORE:  BOWES, J., WECHT, J., and STABILE, J.

OPINION BY WECHT, J.:                    **FILED SEPTEMBER 23, 2014**

In this case involving subsurface mineral rights, Nancy M. Lenau, Daniel T. Lenau, and Kathleen Trishock (collectively, "Appellants"), appeal from the May 1, 2013 order that sustained the preliminary objections of Co-eXprise, Inc. ("Co-eXprise"), and dismissed the Appellants' complaint. For the reasons that follow, we affirm.

The trial court summarized the factual history of this case as follows:

This litigation arises out of the conduct of [Co-eXprise], which, acting as an intermediary, encouraged property owners in Beaver County, Pennsylvania to pool their interests by joining [Co-eXprise's] "CX MarketPlace." A property owner would join the CX MarketPlace by signing a form agreement prepared by [Co-eXprise] titled "MarketPlace Agreement." The MarketPlace Agreement authorized Co-eXprise to competitively bid mineral rights on behalf of the aggregated group of property owners for

the purpose of obtaining the most favorable lease terms for each individual CX MarketPlace member.

Property owners who entered into [Co-eXprise's] MarketPlace Agreement were organized into groups with each group comprised of landowners within a defined geographical area. [Co-eXprise] then sought bids from energy companies on behalf of each group of landowners, who as a group could command superior bargaining power and obtain more favorable terms in leases of their subsurface mineral rights, thereby maximizing each property owner's bonus and royalty payments.[1]  Under the terms of the MarketPlace Agreement, once Co-eXprise obtained a bid from an energy company which contained lease terms that met or exceeded a predetermined threshold amount for bonus and royalty payments (outlined at [Section] 2(f) of the MarketPlace Agreement, [*see* Complaint, 11/21/12, Exhibit D, at 1]), each property owner in the group was obligated to execute a mineral lease with that energy company, which lease would reflect the terms the energy company proposed during the bidding process.

[Co-eXprise] initially promoted the MarketPlace program through mass[]advertising and by conducting meetings with groups of property owners during which Co-eXprise representatives solicited participation in the CX MarketPlace by assuring landowners that MarketPlace participants would obtain the best available bonus and royalty payments through the competitive bidding process.  Promotional materials were prepared by [Co-eXprise] and provided to prospective MarketPlace members via

_____

[1]     The trial court explained such agreements as follows:

[I]n an effort to reap the gas located underground throughout Western Pennsylvania, a representative of an energy company will approach a landowner with an offer to lease the landowner's mineral rights for a term of several years.  In consideration for this mineral lease, the energy company offers an up-front bonus payment, usually based on the acreage of the leasehold, and ongoing royalty payments, which are generally calculated as a percentage of the market value of the extracted gas.

Trial Court Opinion, 4/10/2013, at 1.

regular mail, the Internet, and by hand during promotional meetings. [*See id.* at Exhibits A-C]. Among the materials that [Co-eXprise] supplied [to Appellants], either directly or through [Co-eXprise's] website, was a terms summary, which explained various terms commonly included in oil and gas leases based on [Co-eXprise's] legal opinion. [*See id.* at Exhibit C, at unnumbered pages 1-3 (Lease Summary)]. [Co-eXprise] represented in the MarketPlace Agreement that any resulting lease agreement between the landowner and energy company would contain terms substantially similar to those contained within this [Lease Summary]. These terms were more favorable to the landowner than the terms of the standard lease agreements used by the energy companies.

The MarketPlace Agreement provided for [Co-eXprise] to receive five percent of the up-front bonus in consideration for its services. The money would be paid as soon as the landowner and the highest[-]bidding energy company entered into a lease agreement reflecting the terms of the bid.

On the basis of [Co-eXprise's] representations, [Appellants] entered into MarketPlace Agreements with [Co-eXprise] in January 2011.[1] [Co-eXprise] sought bids on behalf of [Appellants] and fellow MarketPlace participants, and, at the conclusion of the bidding process, identified Chesapeake Appalachia, LLC [(Chesapeake),] as the highest bidder. However, the Chesapeake bid for the Lenau['s] group was lower than a bid that would be binding on the MarketPlace members under the provisions of the MarketPlace Agreement. A bid would be binding on the Lenau['s] group only if it provided for no less than a $3,000 per acre bonus, a 17% royalty, and the substantial inclusion of the sample lease terms. The Chesapeake bid provided for a $2,350 per acre bonus and a 15% royalty. [*See* Complaint, at 9-10 ¶ 26].

---

[1] The Lenau [Appellants] signed the MartketPlace Agreement on or about January 24, 2011, and the Trieschock [Appellants] signed the MarketPlace Agreement on January 20, 2011. [*See* Co-eXprise's Preliminary Objections, 1/04/2013, Exhibit 2 (Lenau Agreement) and Exhibit 3 (Trieschock Agreement)].

[Co-eXprise] notified the Lenau [Appellants] and the other members of their group of the offer from Chesapeake at a June

28, 2011 meeting, and represented that the terms reflected the best market terms available. These [Appellants] and the other members of the Lenau group received an email correspondence on July 15, 2011 encouraging them to accept the terms of the Chesapeake offer by signing an "Agreement to Accept Lease Offer from Chesapeake" [(Agreement to Accept)].[2] The Lenau [Appellants] signed the Agreement to Accept on August 1, 2011[.][3]

> [2] [**See** Complaint, Exhibit F, at 1]. Trieschock received a similar email in September 2011 notifying her of an offer Chesapeake had tendered to landowners in Trieschock's landowner group.

> [3] [**See** Co-eXprise's Preliminary Objections, 1/04/2013,] Exhibit 4. Trieschock, a member of a different group than the Lenau [Appellants], was presented with a different offer and signed the Agreement to Accept that offer on October 7, 2011. [**Id.** at] Exhibit 5.

It appears from the record that [Co-eXprise] continued to recruit landowners into the CX MarketPlace and, pursuant to that recruitment effort, notified other landowners in the area that an offer had been tendered by "a major oil and gas exploration and production company," which offer contained favorable lease terms and the best current market price available in the area. These prospective participants were warned that prices may decline, and, in order to take advantage of the offer, landowners should complete the CX MarketPlace and [Agreement to Accept].[4]

> [4] MarketPlace members and prospective members in the Lenau's group were urged to sign the [Agreement to Accept] no later than August 4, 2011 in order to be eligible to attend the August 5, 2011 lease-signing event. Trieschock, again, a member of a different group, signed the Agreement to Accept on October 7, 2011.

MarketPlace member landowners who elected to accept Chesapeake's offer were directed to attend a lease-signing event where the landowners entered into individual oil and gas leases with Chesapeake.[5]

> [5] Lenau attended the lease[-]signing event on August 5, 2011; Trieschock on October 28, 2011.

> Once a landowner signed a mineral lease with Chesapeake, [Co-eXprise] collected its transaction fee—five percent of the landowner's gross, up-front, bonus payment—directly from Chesapeake.

Trial Court Opinion ("T.C.O."), 4/10/2013, at 1-4.

On November 21, 2012, Appellants filed a "Complaint in Civil Act Class Action," which asserted various causes of action against Co-eXprise, including: (1) breach of contract; (2) unauthorized practice of law; (3) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")[2]; (4) violation of the Pennsylvania Securities Act of 1972; (5) breach of fiduciary duty; and (6) unjust enrichment/disgorgement. **See** Complaint, at 14-25. Specifically, Appellants asserted the foregoing claims as a class action:

> [Appellants] bring this action on behalf of themselves and the following Plaintiff Class: every citizen, or landowner, in the Commonwealth of Pennsylvania who has entered into a [CX MarketPlace Agreement] with [Co-eXprise] and paid [Co-eXprise] a transaction fee pursuant to said agreement, which arose out of a negotiation and consummation of an oil and gas lease through the [CX MarketPlace p]rocess.

*Id.* at 26 ¶ 88. Appellants sought certification of the class action, various forms of compensatory and restitutionary damages, disgorgement of Co-eXprise's transaction fee, and attorneys' fees.

On January 2, 2013, Co-eXprise filed a motion to assign the case to the Commerce and Complex Litigation Center of Allegheny County. That

---

[2]     **See** 73 P.S. § 201-1, *et seq*.

- 5 -

same day, the trial court granted Co-eXprise's motion. On January 4, 2013, Co-eXprise filed preliminary objections in the nature of a demurrer to Appellants' complaint and a brief in support of these objections. In relevant part, Co-eXprise argued that Appellants' claims were legally insufficient, or otherwise meritless. *See* Co-eXprise's Preliminary Objections, 1/04/2013, at 8-18. On January 28, 2013, Appellants filed a brief in opposition to Co-eXprise's preliminary objections. On February 4, 2013, the trial court heard arguments on Co-eXprise's preliminary objections. On April 13, 2013, the court filed a "Memorandum and Order of Court" sustaining Co-eXprise's preliminary objections and dismissing all of Appellants' claims.

On April 19, 2013, Appellants filed a "Motion for Reconsideration and for Leave to File an Amended Brief." On April 26, 2013, Co-eXprise filed a brief in opposition to reconsideration. On May 3, 2013, the trial court denied Appellants' motion for reconsideration.

On May 8, 2013, Appellants filed a timely notice of appeal. The trial court did not direct Appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Consequently, Appellants did not elect to file such a statement. The trial court has not issued a separate opinion pursuant to Pa.R.A.P. 1925(a).

Appellants present the following issues for our consideration:

I.      Whether the trial [c]ourt erred as a matter of law by sustaining [Co-eXprise's] preliminary objections to all [c]ounts of [Appellants' c]omplaint:

A. Where the [t]rial [c]ourt erred as a matter of law in its interpretation of ambiguous contract provisions, which otherwise support a breach of contract claim[] sufficient to overcome preliminary objections?

B. By concluding as a matter of law that the allegations of the [c]omplaint and the [e]xhibits attached thereto including admissions during argument, do not raise a factual issue as to whether [Co-eXprise] have engaged in the unauthorized practice of law? and;

C. By concluding as a matter [of law] that the lease of natural gas rights at issue is **not** a security as defined by the Pennsylvania Securities Act [of 1972]?

D. By dismissing claims of breach of fiduciary duty and unjust enrichment?

Appellants' Brief at 4 (emphasis in original). All of Appellants' claims relate to the trial court's decision to sustain Co-eXprise's preliminary objections in the nature of a demurrer. Our standard of review in this context is well-established:

Our standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.

Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Feingold v. Hendrzak*, 15 A.3d 937, 941 (Pa. Super. 2011) (quoting *Haun v. Community Health Systems, Inc.*, 14 A.3d 120, 123 (Pa. Super. 2011)).

In their first claim, Appellants argue that the terms of the MarketPlace Agreement regarding the payment of transaction fees to Co-eXprise are ambiguous and should be construed in favor of Appellants:

> Specifically, [Appellants] allege[,] and the [e]xhibits and documents support [a conclusion,] that [Co-eXprise] breached [the MarketPlace Agreement] by promising that the payment of the transaction fee will be a written obligation imposed on the successful bidder in the lease agreement, ([e]qual to 5 [percent] multiplied by the gross up[-]front bonus payment upon the completion of each negotiation event), but **failed** to ultimately impose the transaction fee upon the successful bidder, and binding the landowners to a similar renewal term (with the ultimate[ly] successful bidder[,] Chesapeake) at the expiration of the initial five[-]year lease term. In this regard, the [t]rial [c]ourt erred in its interpretation of the contract language as "unambiguous" and consistent with the interpretation advanced by Co-eXprise.

Appellants' Brief at 17 (emphasis in original). Thus, Appellants argue that the MarketPlace Agreement was ambiguous, such that the trial court should not have sustained Co-eXprise's preliminary objections. *Id.* at 20, 22. We disagree.

The legal standards governing our review of the trial court's contract interpretation are axiomatic. "The interpretation of a contract is a matter of law and, as such, we need not defer to the trial court's reading of the [a]greement." *Integrated Project Servs. v. HMS Interiors, Inc.*, 931

A.2d 724, 732 (Pa. Super. 2007) (quoting **Welteroth v. Harvey**, 912 A.2d 863, 866 (Pa. Super. 2006)).

> It is also well[-]established that under the law of contracts, in interpreting an agreement, the court must ascertain the intent of the parties.
>
> In the cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. **Pines Plaza Bowling, Inc. v. Rossview, Inc.**, 145 A.2d 672, 676 (Pa. 1958). When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. **Hutchison v. Sunbeam Coal Corp.**, 519 A.2d 385, 390 (Pa. 1986). When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. **Steuart v. McChesney**, 444 A.2d 659, 663 (Pa. 1982); **Herr's Estate**, 161 A.2d 32, 34 (Pa. 1960).

**Kripp v. Kripp**, 849 A.2d 1159, 1163 (Pa. 2004) (citations modified).

With specific reference to what constitutes "ambiguity" in the context of contract interpretation, our Supreme Court has opined as follows:

> Contractual language is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." **Hutchison**, 519 A.2d at 390. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. **See Gamble Farm Inn, Inc. v. Selective Ins. Co.**, 656 A.2d 142, 144 (Pa. Super. 1995); **Techalloy Co., Inc. v. Reliance Ins. Co.**, 487 A.2d 820, 823 (Pa. Super. 1984). We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. **Steuart**, 444 A.2d at 663.

**Madison Const. Co. v. Harleysville Mut. Ins. Co.**, 735 A.2d 100, 106 (Pa. 1999) (citations modified). Additionally, "[i]t is axiomatic that contractual

clauses must be construed, whenever possible, in a manner that effectuates all of the clauses being considered." **Welteroth**, 912 A.2d at 866 (citing **Flatley by Flatley v. Penman**, 632 A.2d 1342, 1344 (Pa. Super. 1993)). "It is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole." **Southwestern Energy Prod. Co. v. Forest Res., LLC**, 83 A.3d 177, 187 (Pa. Super. 2013) (citing **Shehadi v. Northeastern Nat'l Bank**, 378 A.2d 304, 306 (Pa. 1977)).

In relevant part, the MarketPlace Agreement that is implicated by Appellants' first claim provides as follows:

> **3.    Transaction Fee.**  For the following addresses identified in Exhibit B, Owner[3] shall pay a "Transaction Fee," through the Lease Agreement with the successful Bidder,[4] in an amount equal to 5% multiplied by the gross up front bonus payment upon the completion of each Negotiation Event.  The payment of the Transaction Fee shall be a written obligation imposed on the successful Bidder in the Lease Agreement.  In the event that while this MarketPlace Agreement is in effect, Owner breaches this MarketPlace Agreement and enters a Lease Agreement on any of the Parcels outside of the MarketPlace Agreement, Owner shall be responsible to pay the Transaction Fee pertaining to such Parcel.

---

[3]    In the MarketPlace Agreement, the term "Owner" refers to "the owner of the mineral rights to the Parcels."  MarketPlace Agreement, at 1.  In the instant context, "Owner" refers to Appellants.

[4]    According to the language of the MarketPlace Agreement, the term "Bidder" refers to "oil and gas drillers and other interested lessees (*e.g.*, gas companies, financial institutions, and others that may be interested in obtaining mineral rights in the [p]arcels . . .)."  MarketPlace Agreement, at 1.  Here, "Bidder" refers to Chesapeake.

MarketPlace Agreement, at 1 ¶ 3.

Appellants argue that this language is ambiguous, in that it does not clearly delineate which party bears the burden of paying a "transaction fee":

> There is one sentence in Section 3 of the [MarketPlace Agreement] that is clear and unambiguous[,] which is as follows: "The payment of the transaction fee shall be a written obligation imposed on the successful bidder in a lease agreement." There is nothing ambiguous about this sentence. It mandates that the "success[ful] bidder" (in this case[, Chesapeake]) will have the "obligation" for "payment of the transaction fee".
>
> The [t]rial [c]ourt, attempting to give effect to all of the words in Section 3, **interprets the second sentence as reading**[,] "the successful bidder will make the payment to Co-eXprise on behalf of the owner." [T.C.O. at] 7 . . . . However, that is **not** the language Co-eXprise utilized in the contract. The language utilized does not clearly impose the obligation to pay the transaction fee on the **owner**. Section 3 is ambiguous in that it does not state who the transaction fee will be paid to[,] or whose services are being compensated. Finally, the last sentence of Section 3 states "in the event that while this MarketPlace Agreement is in effect, owner breaches this [M]arket[P]lace [A]greement and enters a lease agreement on any of the parcels outside of the [M]arket[P]lace [A]greement, **owner will be responsible to pay the transaction fee pertaining to such parcel**", which creates ambiguity in relation to the first sentence.

Appellants' Brief at 18-19 (emphases in original).

However, as the trial court explained, Appellants' proposed interpretation of Section 3 of the MarketPlace Agreement is a selective reading that focuses upon the meaning of a single sentence, to the exclusion of the other relevant language:

> Section 3 clearly provides for the landowner to make the five percent bonus payment. The first sentence provides for

- 11 -

[Appellants] to pay a transaction fee of five percent of the gross up-front bonus payment. The second sentence provides that [Chesapeake] will make the five-percent payment to [Co-eXprise] on behalf of [Appellants]. However, if [Appellants], in breach of [their] agreement with [Co-eXprise], enter[] into a contract that does not include a written obligation for [Chesapeake] to make the five-percent payment to [Co-eXprise] on behalf of [Appellants], [Appellants] will be responsible for transmitting the payment.

T.C.O. at 5. We concur with the trial court's cogent interpretation of the instant contract provision. The first sentence of Section 3 unambiguously states that the landowners—in this case, Appellants—bear the financial responsibility of paying Co-eXprise's transaction fee out of the proceeds of their initial bonus payment. The second sentence of Section 3, which places the obligation of actually transmitting those funds upon Chesapeake, does not obviate the Appellants' responsibility to pay, but merely specifies the manner in which payment shall be effected. Contrary to Appellants' claims, the third sentence of Section 3 does not create ambiguity, but merely provides for a contingency in which a landowner breaches the MarketPlace Agreement by entering into a lease agreement that does not expressly provide for the payment of a transaction fee.

By focusing solely upon the meaning of the second sentence of Section 3, Appellants' argument engages in the exact type of limited interpretation that our governing precedent forbids. *See Southwestern Energy Prod.*, 83 A.3d at 187. This Court's consideration of contracts must seek to give full effect to an **entire document**, if possible, and not only those portions

supporting a specific conclusion. *Id.* "Mere disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity." *Pappas v. UNUM Life Ins. Co. of America*, 856 A.2d 183, 187 (Pa. Super. 2004). Instantly, Appellants argue that the second sentence of Section 3 indicates that payment of the "transaction fee" is the sole responsibility of a "successful bidder"— in this case, Chesapeake. However, Appellants' interpretation of the contract flatly ignores the first sentence of Section 3, which clearly indicates that the financial responsibility of payment is upon the landowner. *See* T.C.O. at 5 ("Under [Appellants'] reading of Section 3, the words 'Owner shall pay a "Transaction Fee"' have no meaning. [Co-eXprise's] construction, on the other hand, gives meaning to each provision within Section 3.").

Based upon the foregoing discussion, we conclude that the contract terms of Section 3 of the MarketPlace Agreement are not ambiguous. Consequently, the trial court did not err in sustaining Co-eXprise's preliminary objections on this ground, and Appellants' first claim fails.

In their second claim, Appellants allege that the trial court erred in dismissing Appellants' claim that Co-eXprise engaged in the unauthorized practice of law. *See* Appellants' Brief at 22-23. The trial court has provided an excellent summary of the conduct referenced by Appellants in support of their position:

> In support of their position that [Co-eXprise] is practicing law, [Appellants] refer to the following activities: [Co-eXprise] solicited landowners requesting they participate in its bidding scheme; [Co-eXprise] presented an agreement for the landowners to execute in order for them to receive [Co-eXprise's] services; [Co-eXprise] delivered to the landowners an explanation of the terms of a lease that the winning bidder will be required to use; [Co-eXprise] described to the landowners the terms of the highest bid and recommended that they accept the bid; [Co-eXprise] furnished information to the landowners who accepted the bid as to documents that would need to be brought to the mass signing and other relevant information; and the bidder and the landowner[s] were required to sign the lease agreement provided by [Co-eXprise] which included protections to the landowners that are not typically included in the form leases of the energy company.

T.C.O. at 6-7 (footnote omitted). Thus, Appellants allege that Co-eXprise engaged in the unauthorized practice of law. We disagree.

The unauthorized practice of law is prohibited in Pennsylvania, and such conduct is criminalized. *See* 42 Pa.C.S.A. § 2524(a). Additionally, Section 2524(c) creates a private civil cause of action in connection with the unauthorized practice of law. *Id.* at § 2524(c). In pertinent part, the statute reads as follows:

> **(c) Injunction.**—In addition to criminal prosecution, unauthorized practice of law may be enjoined in any county court of common pleas having personal jurisdiction over the defendant. The party obtaining such an injunction may be awarded costs and expenses incurred, including reasonable attorney fees, against the enjoined party. A violation of subsection (a) is also a violation of the act of December 17, 1968 (P.L. 1224, No. 387), known as the Unfair Trade Practices and Consumer Protection Law.

*Id.*

- 14 -

The Supreme Court of Pennsylvania has thoroughly discussed what constitutes "the practice of law":

> The Pennsylvania Constitution vests with our [Supreme] Court the exclusive authority to regulate the practice of law, which includes the power to define what constitutes the practice of law. Pa. Const. Art. V, § 10(c); ***Dauphin County Bar Association v. Mazzacaro***, 351 A.2d 229, 233 (Pa. 1976). What constitutes the practice of law, however, is not capable of a comprehensive definition. For this reason, [the Supreme] Court has not attempted to provide an all-encompassing statement of what activities comprise the practice of law. ***Office of Disciplinary Counsel v. Marcone***, 855 A.2d 654, 660 (Pa. 2004); ***Shortz et. al. v. Farrell***, 193 A. 20, 21 (Pa. 1937). Thus, we have determined what constitutes the practice of law on a case-by-case basis.
>
> While our Court has addressed the question of what constitutes the practice of law on an individualized basis, we have made clear that paramount to the inquiry is consideration of the public interest. ***Marcone***, 855 A.2d at 658; ***Dauphin County***, 351 A.2d at 233. Consideration of the public interest has two related aspects: protection of the public and prudent regulation so as not to overburden the public good.
>
> Regarding the protection of the public, then Justice, later Chief Justice Stern perhaps best summarized this aspect of the Court's concern in ***Shortz***[:]
>
>> While in order to acquire the education necessary to gain admission to the bar and thereby become eligible to practice law, one is obliged to "scorn delights, and live laborious days," the object of the legislation forbidding practice to laymen is not to secure lawyers a monopoly, however deserved, but, by preventing the intrusion of inexpert and unlearned persons in the practice of law, to assure to the public adequate protection in the pursuit of justice, than which society knows no loftier aim.
>
> ***Shortz***, 193 A. at 24.

\*     \*     \*

- 15 -

> When considering the public interest, our [Supreme] Court has focused on the character of the activities at issue. In **Shortz**, our [Supreme] Court set forth three broad categories of activities that may constitute the practice of law: (1) the instruction and advising of clients in regard to the law so that they may pursue their affairs and be informed as to their rights and obligations; (2) the preparation of documents for clients requiring familiarity with legal principles beyond the ken of ordinary laypersons; and (3) the appearance on behalf of clients before public tribunals in order that the attorney may assist the deciding official in the proper interpretation and enforcement of the law. **Shortz**, 193 A. at 21. More recently, our [Supreme] Court expressed that the practice of law is implicated by the holding out of oneself to the public as competent to exercise legal judgment and the implication that he or she has the technical competence to analyze legal problems and the requisite character qualifications to act in a representative capacity. **Dauphin County**, 351 A.2d at 232-33 (considering whether licensed casualty adjuster's representation of third parties constituted the unauthorized practice of law). Thus, the character of the actions taken by the individual in question is a significant factor in the determination of what constitutes the practice of law.

**Harkness v. Unemployment Comp. Bd. of Review**, 920 A.2d 162, 166-67 (Pa. 2007) (footnotes omitted). "Cognizant that a determination of the practice of law is made on a case-by-case basis, focusing primarily on protection of the public and the public weal, and in doing so, considering the character of the activities . . . , we turn to the facts at issue in this appeal." **Id.** at 167.

Appellants argue that Co-eXprise's actions "directly satisf[y] our Supreme Court's definition of the practice of law because this conduct require[d] abstract understanding of legal principals [*sic*] and refined skill for

their concrete application." Appellants' Brief at 23. Specifically, Appellants

allege that Co-eXprise's actions:

> required an understanding of each landowner's property rights, encumbrances on the property, liens, easements, and certain environmental issues. The transactions contemplated require[d] an understanding of the legal principals [*sic*] implicated by contract law and real property law. Oil, gas and mineral rights law is itself a specialty in Pennsylvania. There are a variety of concepts including surface rights for drilling, surface rights for pipelines, rights to natural gas storage, concerns related to environmental pollution, just to name a few.

*Id.* at 24. While Appellants urge that Co-eXprise's actions constitute the

practice of law, we agree with the trial court's apt assertion that the mere

fact that a company utilizes documents prepared by lawyers, and relies upon

the opinions of lawyers in conducting its business, does not, *ipso facto*,

indicate that a company is practicing law:

> [W]hat [Appellants] describe is a bidding company conducting its business. There is no explanation by [Appellants] as to which of the activities described above constitute the practice of law.
>
> Lawyers are frequently involved in drafting the writings that the more sophisticated party to a transaction will use. The **drafting** of the writings may be the practice of law. But the **use** of those writings has nothing to do with the practice of law.

T.C.O. at 7 (emphases added).

Assuming, *arguendo*, that Co-eXprise's actions touched upon matters

that are typically handled by lawyers, our Supreme Court has specifically

endorsed such actions in the limited context of business transactions:

> There can be no objection to the preparation of deeds and mortgages or other contracts by such brokers **so long as the papers involved pertain to and grow out of their business**

**transactions and are intimately connected therewith**. The drafting and execution of legal instruments is a necessary concomitant of many businesses, and cannot be considered unlawful. Such practice only falls within the prohibition . . . when the documents are drawn in relation to matters in no matter connected with the immediate business of the person preparing them, and when the person so drafting them is not a member of the bar and holds himself out as specially qualified and competent to do that type of work.

*Childs v. Smeltzer*, 171 A. 883, 885-86 (Pa. 1934) (emphasis added).

Instantly, Co-eXprise's actions were limited solely to the subject matter of securing leases for natural gas exploitation on Appellants' respective properties. Appellants have not alleged that Co-eXprise held itself out as a legal actor in any way beyond Co-eXprise's immediate business interests.[5]

_____

[5] Moreover, in *Childs*, the Supreme Court specifically held that "[a] real estate broker is not prohibited from drawing a deed of conveyance or other appropriate instrument relating to property of which he or his associates have negotiated a sale or lease." *Childs*, 171 A. at 886. Although the trial court does not cite *Childs*, its discussion certainly alludes to the many parallels between Co-eXprise's business practices, and those endorsed by *Childs*:

There is not a great deal of difference between the activities performed by [Co-eXprise] in this case and the activities performed by a real estate agent for a seller of residential property. The agent solicits the general public; the agent follows up on leads; the agent is retained by having the seller sign a form agreement prepared by the agent's company; the sales agent explains the terms of the form agreement to the seller before it is signed; there may be bargaining between the sales agent and the seller; the agent makes recommendations to the seller regarding the value of the seller's property and how to respond to offers; unless the buyer is represented by counsel, the agent will have the buyer sign the form sales agreement used by the agent's company; there may be negotiations

*(Footnote Continued Next Page)*

Ultimately, we agree with the trial court's conclusion that Appellants have failed to allege any facts that, if proved at trial, would lead to a conclusion that Co-eXprise was engaged in the unauthorized practice of law. While our Supreme Court has clearly stated that we should guard against unauthorized legal practice, that Court also has cautioned against unnecessarily expanding our definition of what constitutes such practice:

> While the public interest is certainly served by the protection of the public, it is also achieved by not burdening the public by too broad a definition of the practice of law, resulting in the overregulation of the public's affairs. As stated by our [Supreme] Court in **Dauphin County**[:]
>
> > The threads of legal consequences often weave their way through even casual contemporary interactions. There are times, of course, when it is clearly within the ken of lay persons to appreciate the legal problems and consequences involved in a given situation and the factors which should influence necessary decisions. No public interest would be advanced by requiring these lay judgments to be made exclusively by lawyers . . . .
>
> **Dauphin County**, 351 A.2d at 233.

*(Footnote Continued)* ————————————

> between the agent for the seller and the buyer and/or the buyer's agent resulting in modifications to the sales agreement; and if the buyer has an attorney, the attorney will negotiate directly with the agent for the seller.
>
> Also consider the typical transaction involving mineral rights: a representative of the energy company solicits the landowner; the representative furnishes a copy of its form lease for the landowner to sign; the representative explains and/or responds to questions of the landowner about its contents; and the representative assumes responsibility for all of the paperwork.

T.C.O. at 7.

***Harkness***, 920 A.2d at 167.[6]

Based upon the foregoing discussion, we conclude that the trial court did not err in dismissing Appellants' claim that Co-eXprise engaged in the unauthorized practice of law. Appellants were not pursuing legal representation through Co-eXprise. Rather, Appellants engaged in contract negotiations regarding their mineral rights with Co-eXprise, negotiations which Co-eXprise is authorized to undertake as a matter of Pennsylvania law. ***See Childs***, 171 A. at 886. Consequently, Appellants' second claim fails.

In their third issue before this Court, Appellants assert that Co-eXprise has violated the Pennsylvania Securities Act of 1972:

> [Appellants' c]omplaint alleges that Co-eXprise violated the Pennsylvania Securities Act of 1972 by providing investment advice as defined by the Act to [Appellants] and other

---

[6] Moreover, as the trial court points out, endorsing Appellants' definition of what constitutes the "unauthorized practice of law" would have serious commercial consequences:

> The landowners did not look to [Co-eXprise] for legal representation. Except for those landowners who consulted with counsel, the landowners would have viewed themselves as unrepresented persons deciding whether to contract with [Co-eXprise]. . . . Thus, if the courts were to agree with [Appellants'] contention that a complicated, proposed transaction described to a consumer by a more sophisticated party constitutes the unauthorized practice of law, many businesses would be put out of business.

T.C.O. at 6.

- 20 -

landowners. [Appellants] have alleged that Co-eXprise ha[s] not properly registered with the Pennsylvania Securities Commission as required by Section 301 of the Securities Act. The touchstone of [Appellants' c]omplaint is the allegation that the Pennsylvania Securities Act of 1972 defines participation in an oil, gas or mining title or lease (or in payments out of production under such a lease or title) **to be a security** subject to the Act.

Appellants' Brief at 28-29 (citing 70 P.S. § 1-102(t)). Thus, Appellants argue that Co-eXprise improperly acted as an "investment adviser" while "in the business of advising others . . . as to the value of securities or as to the advisability of investing, purchasing, or selling securities[.]" 70 P.S. § 1-102(j).

Appellants' claim calls upon us to interpret the meaning of the Pennsylvania Securities Act of 1972. "Because statutory interpretation is a question of law, our standard of review is *de novo*, and our scope of review is plenary." ***Commonwealth v. Hacker***, 15 A.3d 333, 334 (Pa. 2011) (citing ***Snead v. SPCA of Pennsylvania***, 985 A.2d 909, 912 (Pa. 2009)). "In matters of statutory interpretation, the General Assembly's intent is paramount." ***Id.*** (citing 1 Pa.C.S.A. § 1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.")). This Court previously has identified this underlying intent:

The Pennsylvania Securities Act is remedial legislation. Its primary purpose is to protect the investing public. The Act contemplates an investigation to determine whether the securities are being offered to the public honestly and in good

faith without any intent to deceive or defraud. ***Commonwealth v. Summons***, 41 A.2d 697, 699 (Pa. Super. 1945). That part of the Securities Act[,] therefore[,] which specifies classes of investments which are within the contemplation of the legislation, is to be liberally construed. And the clear intent of the Act is not to be defeated by a too literal reading of words without regard to their context and the evils which the Act clearly was designed to correct.

***Commonwealth v. Yaste***, 70 A.2d 685, 687 (Pa. Super. 1950); ***see also***

***Commonwealth v. Bomersbach***, 393 A.2d 995, 998 (Pa. Super. 1978)

("[T]he section of the [Pennsylvania Securities] Act which delineates the

classes of investments that are to be protected must be liberally

construed.") (citing ***Yaste***, 70 A.2d at 687).

The Pennsylvania Securities Act of 1972 defines "security" as follows:

(t) **"Security"** means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; share of beneficial interest in a business trust; certificate of interest or participation in any profit-sharing agreement; collateral trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting trust certificate; certificate of deposit for a security; limited partnership interest; **fractional undivided interest in oil, gas or other mineral rights**; put, call, straddle, option or privilege on a security, certificate of deposit of a security or group or index of securities, including any interest in the securities or based upon the value of the securities, or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency; membership interest in a limited liability company of any class or series, including any fractional or other interest in such interest, unless excluded by clause (v); or, in general, any interest or instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. All of the foregoing are securities whether or not evidenced by written document.

70 P.S. § 1-102(t) (emphasis added). As noted above, Pennsylvania's definition of a "security" includes the "fractional undivided interest in oil, gas, or other mineral rights." *Id.*

The Pennsylvania Securities Act of 1972 also states the following with regard to "investment advisers":

**§ 1-301.  Registration requirement.**

\* \* \*

(c)   It is unlawful for any person to transact business in this State as an investment adviser unless he is so registered or registered as a broker-dealer under this act or unless he is exempted from registration.   It is unlawful for any person to transact business in this State as an investment adviser representative unless he is so registered or exempted from registration.

*Id.* at § 1-301(c).  In the light of the foregoing, our task is clear.  We must ascertain whether the leasing of mineral rights in this context constitutes a "fractional undivided interest in oil, gas, or other mineral rights" and thus a "security," *see id.* at § 1-102(t), such that Co-eXprise must be registered as an "investment adviser" to engage in its present business practices.

Our Court adjudicated a question very similar to this in *Yaste*, 70 A.2d at 686, albeit under the Pennsylvania Securities Act of 1939.[7]  In *Yaste*, this

---

[7]    The terms of the Pennsylvania Securities Act of 1939 that defined what constitutes a "security" have since been repealed.  *See* 70 P.S. § 32. However, the language used in the earlier iteration of this statute that is relevant to our present inquiry is identical to the current language. *Compare Yaste*, at 686 ("70 P.S. § 32, defines a security in this language: *(Footnote Continued Next Page)*

Court concluded that a "working interest in and to the net proceeds from the sale of . . . oil and gas" constituted a "security" because "sale of oil rights in a variety of forms were intended to be made subject to the regulatory powers of the Commonwealth in our Securities Act." *Id.* at 688. However, in so holding, we specifically exempted the type of royalty agreements implicated by the instant case. Specifically, we relied upon an earlier holding of the U.S. Supreme Court:

> It may be noted that a royalty interest in an oil lease, as the subject matter of sale, ha[s] been held not to be a security within the definition of the Act and therefore not within its purview. . . . [A] royalty interest in an oil lease, as the subject matter of sale, ha[s] been held **not** to be a security for the very reason that it was [considered] real property under the Securities Act of April 13, 1927, P.L. 273, 70 P.S. § 1, *et seq.*, which included "oil, gas, or mining lease or certificate of any interest in or under the same" within the definition of a security. The precise question was before the Supreme Court of the United States in ***Securities and Exchange Comm. v. C.M. Joiner Leasing Corp.***, 320 U.S. 344 (1943). In that case[,] the [U.S. Court of Appeals for the Fifth Circuit] had adopted a construction of the Federal Securities Act of 1933[,] which excluded from its operation all trading in oil and gas leases. The definition of "security" under section 2(1) of the Federal Act of May 27, 1933, as amended, 15 U.S.C. § 77(b)(1), is substantially the same as that of the Pennsylvania Act and includes "fractional undivided interest in oil, gas, or other mineral rights" in the identical language of our Act. In that case[,] the defendants held leases on a large tract of land in Texas which they had obtained in consideration of their

*(Footnote Continued)* _____

. . . . The term 'security' means any . . . **fractional undivided interest in oil, gas, or other mineral rights**.") (emphasis in original), ***with*** 70 P.S. § 1-102 ("'Security' means any . . . fractional undivided interest in oil, gas or other mineral rights.") (emphasis omitted). Thus, despite the relative age of our opinion in ***Yaste***, we conclude that its interpretation remains relevant.

agreement to drill a test well. On the inducement of the proposed exploration well[,] they sold small subdivisions of their leasehold to about fifty purchasers on an acreage basis. The sales literature assured the prospect that the drilling of a well, so located as to test the oil producing possibilities of the offered leaseholds, would be pushed to completion. Other language in the advertising literature emphasized the character of the purchase as an investment and as a participation in an enterprise. In disposing of the question whether the sales of leasehold acreage were sales of "securities[,]" the [C]ourt said:

> It is urged that because the definition mentions "fractional undivided interest in oil, gas, or other mineral rights," it excludes sales of leasehold subdivision by parcels. Oil and gas rights posed a difficult problem to the legislative draftsman. Such rights were notorious subjects of speculation and fraud, but leases and assignments were also indispensable instruments of legitimate oil exploration and production. To include leases and assignments by name might easily burden the oil industry by controls that were designed only for traffic in securities. This was avoided by including specifically only that form of splitting up of mineral interests which had been most utilized for speculative purposes. We do not think the draftsmen thereby immunized other forms of contracts and offerings which are proved as matter of fact to answer to such descriptive terms as "investment contracts" and "securities."

*Joiner*, 320 U.S. at 352.

*Yaste*, 70 A.2d at 687-88 (footnote omitted). Thus, in *Yaste*, the Court determined that arrangements which constituted "[a] form of splitting up of mineral interests . . . utilized for speculative purposes" were sales of securities, but that other transfers of gas rights were not so burdened. *See id.*

Our case law on the subject of which mineral rights leaseholds constitute a "fractional undivided interest in oil and gas" is limited. In

***Martin v. ITM International Trading & Marketing***, 494 A.2d 451, 453 (Pa. Super. 1985), our Court derived some guidance from federal case law, inasmuch as the relevant language in the federal Securities Act of 1933 is identical to the Pennsylvania Securities Act of 1972. ***See Martin***, 494 A.2d at 453; ***compare*** 15 U.S.C.S. § 77b(a)(1), ***with*** 70 P.S. § 1-102(t). Like the ***Martin*** panel, we turn to the federal courts for assistance in determining whether the instant royalty agreements constitute regulated securities. ***See id.***; ***see also Yaste***, 70 A.2d at 687-88.

Our own Third Circuit has explained the meaning of a fractional undivided interest as follows:

> [A]n interest arises when a lessee of mineral rights sells parts of its interest in the rights in order to finance the development of the minerals. These are fractionalized undivided working interests because they give the investor rights to a percentage of the actual minerals "worked" from the lease or the proceeds therefrom and are subject to at least part of the expense of development, operation, or maintenance.

***Penturelli v. Spector, Cohen, Gadon & Rosen, Attorneys at Law, P.C.***, 779 F.2d 160, 165 (3d Cir. 1985).

Furthermore, many federal courts[8] have approved of the analysis set forth in ***Woodward v. Wright***, 266 F.2d 108, 112 (10th Cir. 1959), which explained:

_____

[8] ***See, e.g.***, ***Nolfi v. Ohio Ky. Oil Corp.***, 675 F.3d 538, 547 (6th Cir. 2012); ***Pacific Dunlop Holdings v. Allen & Co.***, 993 F.2d 578, 581 (7th Cir. 1993); ***Adena Exploration, Inc. v. Sylvan***, 860 F.2d 1242, 1244 (5th Cir.
*(Footnote Continued Next Page)*

the sale or offering for sale of an oil and gas lease, or an undivided interest therein, may be the sale of an "investment contract", hence a security, when the transaction carries with it something more than the assignment of a "naked leasehold right", as where the purchasers look entirely to the efforts of other persons to make their investment a profitable venture.

*Woodward*, 266 F.2d at 112.  Under *Woodward*, "if a fractional undivided interest is created for the purpose of sale, the conveyance of the interest is the sale of the security."  *Adena Exploration, Inc. v. Sylvan*, 860 F.2d 1242, 1246 (5th Cir. 1988).

The statutory definition of a security includes both relatively specific categories, composed of "instruments whose names alone carry well-settled meaning," and "more variable" categories, composed of instruments referenced by "descriptive terms."  . . . In *Penturelli v. Spector, Cohen, Gadon & Rosen*, . . . [t]he court noted that a "fractional undivided working interest" in a mineral lease arises "when a lessee of mineral rights sells parts of its interest in the rights in order to finance the development of the minerals."  The court stressed that the 1933 Act specifically enumerates these fractional interests as securities, stating:

Congress chose not to include leases and assignments because they were indispensable instruments of legitimate oil exploration and production and it wanted to avoid burdening the oil industry by controls that were designed only for traffic in securities. On the other hand, Congress did specifically mention in the Acts the fractional undivided interest, which was "that form of splitting up mineral interests which had been most utilized for speculative purposes."

*(Footnote Continued)* ───────────────

1988); *Penturelli*, 779 F.2d 160 at 166; *Gilbert v. Nixon*, 429 F.2d 348, 354 (10th Cir. 1970); *Shimer v. Webster*, 225 A.2d 880, 883 (D.C. 1967); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1346 (S.D.N.Y. 1982).

*Adena*, 860 F.2d at 1247-1248 (footnotes omitted).[9]

Thus, in *Adena*, the Fifth Circuit held that general leases and assignments of oil and mineral rights do not constitute securities. The Court addressed the language of the federal securities statutes and determined that "Congress, in other words, did not leave judges the difficult task of balancing the need for regulation against the burdens to the oil industry. Rather, Congress singled out 'fractional undivided interests in oil and gas' as a form of oil and gas rights subject to securities regulation." *Id.* at 1245; *see also Commonwealth v. Frye*, 853 A.2d 1062, 1066 (Pa. Super. 2004) ("The principle of statutory construction known as '*expressio unius est exclusio alterius*' holds that the mention of a specific matter in a general statute implies the exclusion of other matters not mentioned therein.") (citing *Pane v. Commonwealth Dep't of Highways*, 222 A.2d 913 (Pa. 1966)).

Similarly, the Sixth Circuit held that, when determining whether a transaction is a "fractional undivided interest[] in oil and gas" and therefore

_____

[9] Interpreting the same language, the United States District Court for the Central District of Illinois observed that Congress intended "to specifically include as securities 'only that form of splitting up of mineral interests which had been most utilized for speculative purposes.'" *Fearneyhough v. McElvain*, 598 F. Supp. 905, 907 (C.D. Ill. 1984) (holding that "the sale of the entire leasehold interest in the oil and gas rights in plaintiffs' land does not constitute the sale of a security within the meaning of the 1933 and 1934 Acts, notwithstanding the fact that the plaintiffs retained an overriding one-eighth (1/8) royalty interest.").

a security subject to regulation, "[a] direct purchase of an oil lease, with the purchase guaranteed by oil production, is distinct from partnership and joint-venture investments in speculative oil wells." *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 546 n.5 (6th Cir. 2012) (citing *Graham v. Clark*, 332 F.2d 155, 156 (6th Cir. 1964) ("[T]he transfer of all of one's interest in and to a specific oil and gas lease is not a security within the meaning of the Act.")). In *Nolfi*, the Sixth Circuit specifically distinguished between "a working interest in a well," which it determined was a "fractional undivided interest," and "an assignment of a lease on mineral rights," which was not a security under 15 U.S.C.S. § 77b(a)(1). *Id.* at 546.

In the instant case, Appellants argue that their involvement with Co-eXprise created a security interest because they "invest[ed] money in a common enterprise and [were] lead [*sic*] to expect profits solely from the efforts of the promoter or a third party." Appellants' Brief at 31 (citing *Martin*, 494 A.2d at 451). Specifically, Appellants claim that "each landowner made the 'investment' when they made the initial purchase of their tract of land, and based on [Co-eXprise]'s market place bidding process conveyed a lease interest based on the expectation of realizing profits, in the form of royalty payments, solely from the efforts of [Co-eXprise] or a third party, Chesapeake[.]" *Id.* at 32. We disagree.

Preliminarily, Appellants' reliance upon *Martin* is misplaced. Appellants cite *Martin* for the "classic definition of an 'investment contract'" originally set forth in *S.E.C. v. Howey*, 328 U.S. 293 (1946), which provides

that "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ." ***Martin***, 494 A.2d at 453 (citing ***Howey***, 328 U.S. at 298-99).

First, Appellants' claim that they purchased their individual tracts of land as an investment in the "common enterprise" of the leasehold agreements offered by Co-eXprise is contradicted by their own pleading, in which they acknowledge that they were already landowners when they were first approached by Co-eXprise. (***See*** Complaint, at 5 ¶¶ 11-12). Therefore, Appellants' claim that the security at interest is an investment contract is belied by the record. ***See Howey***, 328 U.S. at 298-99.

Second, the United States Supreme Court has held: "the ***Howey*** economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within any of the examples listed in the statutory definition of 'security.'" ***Landreth Timber Co. v. Landreth***, 471 U.S. 681, 691 (1985). Thus, where the question is whether the contested instrument is another type of security pursuant to 70 P.S. § 1-102(t), specifically, a fractional undivided interest in oil, gas or other mineral rights, the ***Howey*** test, as described in ***Martin***, does not apply.

Here, with the assistance of Co-eXprise, Appellants entered into an agreement to lease their mineral rights to Chesapeake, while retaining the

right to royalty payments. *Cf. Fearneyhough v. McElvain*, 598 F. Supp. 905, 907 (C.D. Ill. 1984). The agreement with Chesapeake does not split up the interest in the leasehold for speculative purposes or to finance the development of wells, but simply contracts for a "direct purchase of an oil lease, with the purchase guaranteed by oil production[.]" *Nolfi*, 675 F.3d at 546 n.5. Thus, under federal precedent, it would not constitute a fractional undivided interest in the mineral rights, and would not be a security. *See Adena*, 860 F.2d at 1245. We believe this approach is consistent with our own case law, which emphasizes that "a royalty interest in an oil lease, as the subject matter of sale, ha[s] been held not to be a security within the definition of the Act[.]" *Yaste*, 70 A.2d at 687. Accordingly, the agreements at issue here are not securities, and therefore are not regulated by the Pennsylvania Securities Act, 70 P.S. §§ 1-101, *et seq*. Appellants' claims under the Act therefore would not merit relief, and the trial court did not err in granting Co-eXprise's preliminary objections on this ground. The third issue lacks merit.

Finally, Appellants combine their fourth and fifth issues and assert that the trial court "erred by dismissing claims of breach of fiduciary duty and unjust enrichment." Appellants' Brief at 36. However, Appellants forthrightly "concede that if this Honorable Court affirms the Trial Court with regard to dismissal of counts alleging unauthorized practice of law, and breach of the Securities Act, the equitable disgorgement/unjust enrichment claim also fails." *Id.* (emphasis omitted). Appellants having done so, we

need only address their claim that Co-eXprise breached an alleged fiduciary duty.

Regarding this claim, Appellants assert:

that Co-eXprise assumed a fiduciary duty to [them] in three distinct manners, (1) by agreeing to undertake to represent [Appellants'] interest in dealing with the potential bidders which duty arose [by] virtue of the Market[P]lace Agreement, (2) by engaging in the unauthorized practice of law, and (3) by acting as an investment advisor.

Specifically, [Appellants] contend that a breach of fiduciary duty claim arises by virtue of the Market[P]lace Agreement which contemplated that Co-eXprise would be vetting potential bidders to make sure they are "approved bidders" in order to have access to the Co-[eX]prise Market[P]lace and a "negotiation event."

Appellants' Brief at 36-37 (record citation omitted). Because Appellants have failed to identify any breach of duty owed to them by Co-eXprise, we disagree.

In their complaint, Appellants contend the following:

78. By entering into the [Co-eXprise] Market[P]lace Agreement, [Co-eXprise] assumed a fiduciary duty toward [Appellants] because it was given the exclusive right and control over [Appellants'] property, oil, gas and mineral rights to try and lease them through the [Co-eXprise] Market[P]lace process which [Co-eXprise] maintained complete exclusive control over. The [Co-eXprise] Market[P]lace Agreement provided that if [Appellants] leased their oil and gas rights outside of the [Co-eXprise] Market[P]lace Agreement then [Appellants] would still be obligated to pay [Co-eXprise] the transaction fee. A fiduciary relationship arises whenever the relative position of the parties is such that one has the power and means to take advantage of the other or where there is a dependence or justifiable trust on the other. It also arises because [Co-eXprise] assumed a relationship of trust and confidence toward [Appellants].

79. A fiduciary duty arose on behalf of [Co-eXprise] toward [Appellants], also, by virtue of the fact that it, through its authorized employees, [Co-eXprise] was engaging in the practice of law (although unauthorized) and performing investment advisory services.

80. [Co-eXprise] breached this fiduciary duty owed toward [Appellants], and as a result of said breach, [Appellants] were collectively damaged in an amount totaling $31,246.39, which were the total fees paid collectively by [Appellants] to [Co-eXprise].

Complaint, at 23-24 ¶¶ 78-80.

The trial court observed that there are "no factual allegations which would support a finding that [Co-eXprise] breached any duties owed to [Appellants]. Second, the only harm described in the [c]omplaint is [Co-eXprise]'s receipt of $31,246.39 in transaction fees. [Appellants] were obligated to pay these fees pursuant to the terms of the contract between [them]." T.C.O. at 11. We agree with the trial court's assessment.

Appellants' bald claim that a breach of fiduciary duty occurred, without explanation, failed to plead any material facts regarding what the alleged breach was. *See id.* at 24 ¶ 80. Even giving Appellants the benefit of "all inferences reasonably deducible" from the allegations in the complaint, Appellants failed to identify the manner in which Co-eXprise breached a duty to them. *See Feingold*, 15 A.3d at 941. Although Appellants contended that "if [Appellants] leased their oil and gas rights outside of the [Co-eXprise] Market[P]lace Agreement then [Appellants] would still be obligated to pay [Co-eXprise] the transaction fee," *id.* at 23 ¶ 78, by their own admission, Appellants signed leases with Chesapeake and did not lease their

- 33 -

oil and gas rights outside of the agreement. *See id.* at 11 ¶ 29. Further, as previously discussed, Co-eXprise was not engaged in the practice of law or investment advisory services, and therefore breached no duty upon these grounds. *See id.* at 23-24 ¶ 79.

Accordingly, Appellants' general allegation of breach is insufficient to support this element of the claim, and Appellants therefore failed to state a claim for breach of a fiduciary duty. *See Grose v. P&G Paper Prods. (In re Grose)*, 866 A.2d 437, 442 (Pa. Super. 2005).

Moreover, "[i]t is a truism that Appellant[s] can establish a jury question regarding the alleged breach of a fiduciary duty only if [they] first establish[] a jury question that such a duty attaches to [an a]ppellee[] in the first instance." *Rock v. Meakem*, 61 A.3d 239, 257 (Pa. Super. 2013). "There is a crucial distinction between surrendering control of one's affairs to a fiduciary or confidant or party in a position to exercise undue influence and entering an arms[-]length commercial agreement, however important its performance may be to the success of one's business." *eToll, Inc. v. Elias/Savion Adver.*, 811 A.2d 10, 23 (Pa. Super. 2002) (citing *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*, 28 F. Supp. 2d 947, 952-953 (E.D. Pa. 1998)).

> Most commercial contracts for professional services involve one party relying on the other party's superior skill or expertise in providing that particular service. Indeed, if a party did not believe that the professional possessed specialized expertise worthy of trust, the contract would most likely never take place.

This does not mean, however, that a fiduciary relationship arises **merely because one party relies on and pays for the specialized skill or expertise of the other party**. Otherwise, a fiduciary relationship would arise whenever one party had any marginally greater level of skill and expertise in a particular area than another party. Rather, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by "overmastering influence" on one side or "weakness, dependence, or trust, justifiably reposed" on the other side. A confidential relationship is marked by such a disparity in position that the inferior party places complete trust in the superior party's advice and seeks no other counsel, so as to give rise to a potential abuse of power.

*Id.* at 23 (citations omitted, emphasis added).

Here, Appellants simply alleged the existence of a contract and "a relationship of trust and confidence" with Co-eXprise. Complaint, at 23-24 ¶ 78. The complaint did not allege any "overmastering influence" or "weakness, dependence, or trust, justifiably reposed" in Appellants' contractual relationship with Co-eXprise. *See eToll, Inc.*, 811 A.2d at 23 (citations omitted). Thus, Appellants have failed to plead sufficient facts to state a claim that the relationship with Co-eXprise was fiduciary, and not merely contractual. *Rock*, 61 A.3d 239 at 257. Appellants have failed to state a claim for breach of fiduciary duty, and the trial court did not commit an error of law in granting Co-eXprise's preliminary objection to this count. *See Feingold*, 15 A.3d at 941. Appellants' final issue does not merit relief, and the trial court properly dismissed the complaint.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/23/2014