J-A01034-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

GREENVILLE SURGICAL ASSOCIATES, P.C., : IN THE SUPERIOR COURT OF PENNSYLVANIA

    Appellee

    v.

RODOLFO ARREOLA, M.D.,

    Appellant : No. 678 WDA 2014

Appeal from the Judgment entered April 7, 2014,
Court of Common Pleas, Erie County,
Civil Division at No. 14153-2004

GREENVILLE SURGICAL ASSOCIATES, P.C., : IN THE SUPERIOR COURT OF PENNSYLVANIA

    Appellee

    v.

RODOLFO ARREOLA, M.D.,

    Appellant : No. 737 WDA 2014

Appeal from the Order dated April 22, 2014,
Court of Common Pleas, Erie County,
Civil Division at No. 14153-2004

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE and ALLEN, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED JULY 8, 2015**

Rodolfo Arreola, M.D. ("Dr. Arreola") appeals from the April 7, 2014 judgment entered in favor of Greenville Surgical Associates, P.C. ("GSA") following a non-jury trial, and the April 22, 2014 order denying Dr. Arreola's post-trial motions.  Upon review, we reverse the judgment and remand for

the entry of judgment in favor of Dr. Arreola, rendering the April 22, 2014 order moot.[1]

Beginning in approximately 1990, James J. Kolenich, M.D. ("Dr. Kolenich"), a board-certified general surgeon, served as the lone officer and shareholder of GSA. In 2001, he began discussing with UPMC Horizon, the hospital with which GSA was affiliated, the need for a second surgeon in the area and at GSA. To that end, UPMC Horizon recruited Dr. Arreola. On July 30, 2001, Dr. Arreola, GSA and UPMC Horizon signed a recruitment agreement, which provided, in pertinent part, as follows:

> 2. Commencing on or before the Start Date and continuing **throughout the term of this Agreement, [Dr. Arreola] shall practice medicine on a full-time basis in Hospital's Service Area** and outlying communities, excluding any other employment or professional duties, as are usual and customary in the area of [Dr. Arreola]'s specialty.
>
> \* \* \*
>
> 5. During the first two years of this Agreement, Hospital shall advance [GSA] on behalf of [Dr. Arreola] on a monthly basis, sums of money to guarantee that for the first two years of [Dr. Arreola]'s practice at Hospital ("Guarantee Period"),

---

[1] On September 2, 2014, GSA filed a motion to quash the instant appeal based upon Dr. Arreola's alleged failure to preserve several arguments before the trial court for appeal. **See generally** Motion to Quash Appeal, 9/2/14. Because we base our decision entirely on arguments preserved in the court below, we deny the motion. **See** Dr. Arreola's Proposed Findings of Fact and Conclusions of Law, 10/3/11, ¶¶ 31, 49, 59-61, 72, 156, 158-159; Dr. Arreola's Motion for Post-Trial Relief, 10/29/13, ¶¶ 53-58, 62, 66-71.

[Dr. Arreola] receives actual cash receipts equal to $300,000 in the first year of the Guarantee Period and $324,000 in the second year of the Guarantee Period,

(a) During this Agreement, on or before the 15th day of each month, [GSA] shall submit to Hospital a statement identifying the cash receipts attributable to [Dr. Arreola]'s practice during the prior month(s). Within 30 days of receipt of that statement and subject to such verification as is reasonably necessary, Hospital will advance to [GSA] on behalf of [Dr. Arreola] an amount calculated as (i) **$25,000 monthly during the first 12 months of the Guarantee Period and $27,000 monthly during the last 12 months of the Guarantee Period** (the "Monthly Guarantee Amount") minus (ii) any and all cash receipts for the month from whatever source attributable to [Dr. Arreola]'s practice ("Payments"). Notwithstanding this paragraph 5(a), Hospital will advance each of the first three Monthly Guarantee Amounts on or before the 1st business day of these three months beginning with the Start Date.

(b) **Payments when advanced by Hospital to [GSA] shall be treated as a loan to [GSA] and shall be subject to repayment with interest** on such sums from the date they were advanced computed at the prime rate of interest on the date of this Agreement reported by the Wall Street Journal plus 1% (the "Applicable Interest Rate") in accordance with Sections 5, 6 and 7 of this Agreement and documented with a promissory note in the form attached hereto as Exhibit "B" (the "Note").

(c) **If in any month during the Guarantee Period the [Dr. Arreola]'s cash receipts** (i.e., 5(a)(ii) above) **exceeds the Monthly Guarantee Amount** (i.e., 5(a)(i)), **such excess shall be immediately paid to Hospital by**

**[GSA]** to the extent of any unpaid loan balance and accrued interest on account of prior advances by Hospital ("Paybacks").

(d) **For purposes of determining the Monthly Guarantee Amount, the parties agree that the amount was determined based on an annual salary for the [Dr. Arreola] of $160,000 and $184,000 in Years 1 and 2 of the Guarantee Period respectively as well as expenses directly attributable to [Dr. Arreola]'s practice which shall mean those reasonable costs and expenses directly related to the operation of [Dr. Arreola]'s practice as outlined in Exhibit C.** Allowable expenses shall not include, among other things, any personal expenses such as an automobile, personal debts or loans and any payment to [Dr. Arreola]'s deferred compensation plan and/or the allocation/reallocation of any practice expenses that existed prior to initiation of [Dr. Arreola]'s practice.

\*    \*    \*

7. Notwithstanding the above, as an alternative means of repayment, Hospital agrees that **the Net Amount advanced by Hospital … shall be forgiven and the Note executed as of such date shall be canceled if, at all relevant times up until and throughout the Guarantee End Date, [Dr. Arreola] and [GSA] have met (as applicable) all of the following requirements:**

(a) **[Dr. Arreola] shall have engaged in the full-time practice of General Surgery in the Hospital's Service Area at Hospital and made services available to the public in accordance with the provisions of this Agreement;**

(b) [Dr. Arreola] shall have worked a normal work week as is customary for [Dr. Arreola]'s in the

- 4 -

area who practice in [Dr. Arreola]'s specialty unless unable to do so due to disability;

(c) [Dr. Arreola] and [GSA] shall not have restricted the number of Medicare and Medicaid patients treated by [Dr. Arreola] or [GSA];

(d) [Dr. Arreola] and [GSA] shall have accepted patients referred by Hospital's referral service irrespective of ability to pay;

(e) [Dr. Arreola] and [GSA] shall not have limited the number of indigent or charitable patients seen or treated and shall have kept adequate records of all such patients and made those records available to Hospital upon reasonable request;

(f) [Dr. Arreola] shall have assisted Hospital in its educational programs as may be reasonably requested by Hospital;

(g) [Dr. Arreola] shall have participated in a call coverage arrangement, irrespective of the patients' ability to pay;

(h) Subject to also fulfilling his other duties hereunder, [Dr. Arreola] shall have assisted Hospital in the development of community services as may be reasonably requested by Hospital, and

(i) **[Dr. Arreola] and [GSA] shall have otherwise satisfied all of his/its obligations under this Agreement.**

\* \* \*

14. **The commencement date of this Agreement shall be September 1, 2001 and it shall terminate on August 31, 2007**, unless otherwise set forth in this Agreement.

Plaintiff's Exhibit 1 (Recruitment Agreement), ¶¶ 2, 5, 7, 14 (emphasis added). The promissory note, referenced above and included as Exhibit B to the recruitment agreement, included a promise by Dr. Arreola and GSA to pay the full amount of the money loaned by UPMC Horizon to GSA for the months Dr. Arreola's cash receipts totaled less than the Monthly Guaranteed Amount. Exhibit C to the recruitment agreement set forth a detailed schedule of expenses that the Monthly Guaranteed Amount was to cover:

| ANNUAL PRACTICE EXPENSES | YEAR 1 | YEAR 2 |
|---|---|---|
| Physician Gross Salary | $160,000 | $184,000 |
| Part Time Secretary (increase RN hours) | $40,000 | $40,000 |
| Pension | $22,000 | $22,000 |
| Malpractice Insurance | $20,000 | $20,000 |
| Term Life Insurance | $2,400 | $2,400 |
| Cell Phone | $1,100 | $1,100 |
| Gas Credit Card | $2,100 | $2,100 |
| Meetings and Board Exams | $4,000 | $4,000 |
| Journals | $350 | $350 |
| Disability Insurance | $6,000 | $6,000 |
| Phone & Advertising | $7,500 | $7,500 |
| Health Insurance | $5,300 | $5,300 |
| Personal Liability Insurance | $1,100 | $1,100 |
| Workers Compensation | $750 | $750 |
| Dues for Professional Organizations | $1,450 | $1,450 |
| Extra Office Supplies | $6,800 | $6,800 |
| Extra Office Space (800 sq.ft. @ $12/sq.ft.) | $9,600 | $9,600 |
| Contingency Expenses | $4,000 | $4,000 |
| Legal & Accounting Costs | $5,550 | $5,550 |
| TOTAL EXPENSES | $300,000 | $324,000 |

*Id.* at Exhibit C.

Also on or about July 30, 2001, Dr. Arreola and GSA entered into an employment contract, which stated, in relevant part: "[Dr. Arreola]

expressly agrees to indemnify and hold [GSA] harmless from and against any indebtedness, liabilities, costs, damages or other losses under the Recruitment Agreement with UPMC Horizon … or the Promissory Note attached to such Recruitment Agreement[.]"  Plaintiff's Exhibit 2 (Employment contract), ¶ 15(b).

Dr. Arreola began working for GSA in September 2001.  In accordance with the recruitment agreement, UPMC Horizon issued money to GSA from between September 2002 and September 2003 in amounts necessary to cover the disparity between Dr. Arreola's cash receipts for those months and the Guaranteed Minimum Amount, $25,000 in 2002 and $27,000 in 2003. The amount loaned by UPMC Horizon to GSA pursuant to the recruitment agreement totaled $184,800.24.  Dr. Arreola's cash receipts began to exceed the Guaranteed Minimum Amount in July 2002 and continued to do so almost continuously through the end of the Guarantee Period in September 2003.[2]  The amount of income generated by Dr. Arreola for GSA during his tenure with GSA totaled $702,947.42.

During the Guarantee Period, GSA made expenditures to expand the practice and remodel the office.  In June 2003, Dr. Kolenich sent Dr. Arreola a letter detailing his "intentions with regard to [Dr. Arreola's] entry into the

---

[2]  The record reflects that Dr. Arreola's cash receipts did not exceed the Guaranteed Minimum Amount in one month of 2002, when his receipts totaled $19,509.  **See** Plaintiff's Exhibit 5 (Dr. Arreola's Receipts); Defendant's Exhibit A (Loan Balance Calculation).

practice." Defendant's Exhibit E. Therein, Dr. Kolenich indicated that if Dr. Arreola passed his boards in the fall of 2003, he believed Dr. Arreola could "buy into" GSA as a shareholder of the corporation. *Id.*

On July 18, 2003, Dr. Arreola gave Dr. Kolenich a letter of resignation. In response thereto, Dr. Kolenich authored a letter to Dr. Arreola on July 29, 2003, in relevant part, "remind[ing]" Dr. Arreola "of the financial obligation [he has] to UPMC/Horizon per [his] employment contract with [GSA]," referring specifically to paragraph 15(b) of the employment contract. Defendant's Exhibit G (7/29/03 Letter from Dr. Kolenich to Dr. Arreola). On September 19, 2003, Dr. Arreola ceased working for GSA and did not continue to work in the UPMC Horizon service area.

GSA made payments on the loans from UPMC Horizon in August 2002, September 2002 and July 2003. Because of the other expenditures GSA made during the Guarantee Period, however, it was reportedly financially unable to make any additional payments on the loans. Following Dr. Arreola's departure from the UPMC Horizon practice area, GSA made two additional payments to UPMC Horizon in November 2003 and December 2003, respectively, fully satisfying the outstanding debt owed pursuant to the recruitment agreement. The amount GSA repaid, including accrued interest, totaled $209,699.76.

On November 15, 2004, GSA commenced an action against Dr. Arreola by filing a praecipe for writ of summons. One year later, GSA filed a nine-

count complaint against Dr. Arreola. Following multiple filings by both parties, the case ultimately came before the trial court for a bench trial, held on February 28, March 1, and May 25, 2011. By agreement of the parties, the bench trial addressed only the first four counts of the complaint, sounding in breach of contract and raising a claim for indemnification/contribution by Dr. Arreola to GSA.

On April 5, 2012, the trial court entered an order and opinion. The trial court found Dr. Arreola liable to GSA based upon his failure to work in UPMC Horizon's service area for six years, concluding that this constituted a "material breach," of the recruitment agreement, causing GSA's forfeiture of the loan forgiveness provision contained therein. Trial Court Opinion, 4/5/12, at 14-16. The trial court determined that "GSA's failure to make payment obligations under the [r]ecruitment [a]greement[] was due to GSA's cash flow shortages," and that this "was not a material breach" by GSA of the recruitment agreement. *Id.* at 10, 14. It further concluded that Dr. Arreola's obligation pursuant to paragraph 15(b) of the employment contract was not limited to those expenses appearing in Exhibit C to the recruitment agreement, as those were only "projected expenses," for which UPMC Horizon would cover the cost through its loans. *Id.* at 13. It therefore found Dr. Arreola liable to GSA for the $209,669.76 GSA paid to

UPMC Horizon for loans pursuant to the recruitment agreement[3] and $182,761[4] for other losses not contemplated by Exhibit C to the recruitment agreement that GSA incurred during Dr. Arreola's tenure.

GSA filed a praecipe for the entry of judgment on April 18, 2012. On May 30, 2012, Dr. Arreola filed a petition to strike or open the judgment asserting that because there were five remaining counts of the complaint still outstanding, the entry of judgment on the trial court's April 5, 2012 order was improper. The trial court denied the motion. Dr. Arreola appealed to this Court and we vacated the trial court's order and remanded the case for action on the remaining counts of GSA's complaint and for Dr. Arreola to file post-trial motions if he elected to do so. *See GSA v. Arreola*, 1151 WDA 2012 (Pa. Super. Sep. 9, 2013) (unpublished memorandum).

On remand, GSA voluntarily discontinued the remaining outstanding counts of the complaint on October 24, 2013. On October 29, 2013, Dr.

---

[3] Relying on principals of joint and several liability and contribution, the trial court also found that by signing the promissory note and breaching the recruitment agreement, Dr. Arreola was required to reimburse GSA for half of the amount it paid to UPMC in satisfaction of the loans – $104,849.88 – but because it found that under the employment contract, "Dr. Arreola [was] responsible for the entirety of the indebtedness," it concluded that "this need not be considered since GSA cannot recover the same loss twice." Trial Court Opinion, 4/5/12, at 12-13 & n.4.

[4] The trial court arrived at this number based upon the testimony of GSA's expert witness, Robert Sherbondy, who testified that during the two years of Dr. Arreola's employment, GSA suffered losses directly attributable to Dr. Arreola's employment of $182,761. Trial Court Opinion, 4/5/12, at 11; *see also* Plaintiff's Exhibit 3 (Robert Sherbondy Deposition), at 35-36.

Arreola filed a timely post-trial motion. GSA filed an answer to the post-trial motion on November 22, 2013. The parties filed briefs in support of their respective positions, following which Dr. Arreola filed a motion requesting leave to file a supplemental post-trial motion nunc pro tunc. GSA filed an answer to this motion on March 14, 2014. Because more than 120 days had passed since Dr. Arreola originally filed his post-trial motion and the trial court had not yet issued a decision thereon, GSA filed a praecipe for the entry of judgment on April 7, 2014. On April 23, 2014, Dr. Arreola filed a timely notice of appeal from the entry of judgment.

On April 22, 2014, the trial court entered an order denying Dr. Arreola's request to file a supplemental post-trial motion nunc pro tunc and adopting its April 5, 2012 opinion and order. On May 2, 2014, Dr. Arreola filed a timely notice of appeal from this order. On June 19, 2014, this Court sua sponte consolidated the two appeals.

Dr. Arreola raises the following issues on appeal for our review:

A. Whether the trial court misinterpreted the recruitment agreement to find that Dr. Arreola had caused a forfeiture of loan forgiveness?

B. Whether the trial court misinterpreted the promissory note to find Dr. Arreola liable thereunder to GSA?

C. Whether the trial court erred by misinterpreting the employment contract to find that Dr. Arreola was liable to GSA for GSA's operating losses?

> D. Whether the trial court erred by awarding prejudgment interest?
>
> E. Whether the motion for leave to file [a] supplemental motion for post-trial relief should have been granted?

Dr. Arreola's Brief at 1-2.[5]

Dr. Arreola's first three issues on appeal challenge the trial court's determination that he was responsible for indemnifying GSA for the money it paid to UPMC Horizon under the recruitment agreement and for the money GSA expended during his tenure for expenses outside of those amounts included in Exhibit C to the recruitment agreement. These present questions of contract interpretation. "Since contract interpretation is a question of law, our review of the trial court's decision is de novo and our scope is plenary." **Bair v. Manor Care of Elizabethtown, PA, LLC**, 108 A.3d 94, 96 (Pa. Super. 2015) (citation and quotation marks omitted). The goal of contract interpretation is to "ascertain the intent of the parties." **Lenau v. Co-eXprise, Inc.**, 102 A.3d 423, 429 (Pa. Super. 2014)

> In the cases of a written contract, the intent of the parties is the writing itself. If left undefined, the words of a contract are to be given their ordinary meaning. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is

---

[5] Based upon our resolution of Dr. Arreola's first three issues, we need not address the remaining two issues raised on appeal.

> patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances.

*Id.* at 429-30 (internal citations omitted). Language in a contract is "ambiguous" "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Id.* at 430. (citation omitted).

At the outset, we observe that the sole basis for finding any obligation by Dr. Arreola to GSA is under the employment contract. As Dr. Arreola correctly observes, GSA and Dr. Arreola owed no duty to one another under the promissory note and recruitment agreement. Dr. Arreola's Brief at 26. UPMC Horizon was the only entity with standing to sue to enforce the recruitment agreement and promissory note; GSA could not.[6] Thus, unless Dr. Arreola failed to satisfy his obligations to GSA under the employment contract, his obligations under the recruitment agreement are irrelevant for purposes of this appeal. His alleged breach of the recruitment agreement – let alone the materiality of the breach – by failing to work in the UPMC Horizon service area for six years has no bearing on the outcome of this case. The only question is whether Dr. Arreola breached or otherwise failed to satisfy the requirements of the employment contract.

---

[6] We note that there are no obligations inter se under the promissory note, it simply secured the recruitment agreement.

The provision of the employment contract central to this appeal is the indemnity provision contained in paragraph 15(b). "An agreement to indemnify is an obligation resting upon one person to make good a loss which another has incurred or may incur by acting at the request of the former, or for the former's benefit." **Potts v. Dow Chem. Co.**, 415 A.2d 1220, 1221 (Pa. Super. 1979) (en banc) (citation omitted). The right to indemnification depends, in relevant part, on "the scope of the indemnification agreement; the reasonableness of the underlying claim; its coverage by the indemnification agreement; [and] the reasonableness of the alleged expenses[.]" **McClure v. Deerland Corp.**, 585 A.2d 19, 22 (Pa. Super. 1991) (citation omitted).

As stated above, pursuant to paragraph 15(b) of the employment contract, Dr. Arreola "agree[d] to indemnify and hold [GSA] harmless from and against any indebtedness, liabilities, costs, damages or other losses under the Recruitment Agreement with UPMC Horizon … or the Promissory Note attached to such Recruitment Agreement[.]" Plaintiff's Exhibit 2 (Employment Contract), ¶ 15(b). The record reflects that Dr. Arreola did just that – he generated sufficient revenue above the guaranteed monthly amount ($25,000 for the first year, $27,000 for the second year) for enough months to allow GSA to repay the money it received from UPMC Horizon pursuant to the recruitment agreement. N.T., 2/28/11, at 53; Plaintiff's Exhibit 5 (Dr. Arreola's Receipts); Defendant's Exhibit A (Loan Balance

Calculation). There was indebtedness created under the recruitment agreement at the beginning of Dr. Arreola's tenure – UPMC Horizon provided loans to GSA in the months Dr. Arreola earned less than $25,000. *See* Plaintiff's Exhibit 1 (Recruitment Agreement); Plaintiff's Exhibit 5 (Dr. Arreola's Receipts); Plaintiff's Exhibit 22 (Downing Exhibit 31). However, Dr. Arreola earned revenue in excess of the guaranteed amount for all but one month of the remaining time of his employment with GSA. *See* Plaintiff's Exhibit 5 (Dr. Arreola's Receipts), 22 (Downing Exhibit 31); Defendant's Exhibit A (Loan Balance Calculation). Pursuant to the recruitment agreement, GSA had an obligation to use the revenue earned by Dr. Arreola over the guaranteed amount each month to repay the amounts previously loaned by UPMC Horizon to GSA. *See* Recruitment Agreement, ¶ 5(c). Instead of repaying all of the money it owed to UPMC Horizon, the record reflects that GSA decided to allocate the revenue earned by Dr. Arreola to other sources, a decision over which Dr. Arreola had no control. *See* Dr. Arreola's Brief at 20; Plaintiff's Exhibit 4 (Sherbondy Deposition Exhibits); Plaintiff's Exhibit 17 (Ruthanne Beighley Deposition), at 33; Defendant's Exhibit H (Dr. Kolenich Deposition), at 59-60.

To permit GSA to benefit from the revenue earned by Dr. Arreola pursuant to the recruitment agreement and additionally require Dr. Arreola to indemnify GSA for the money it paid to UPMC Horizon under the recruitment agreement would be to allow double recovery by GSA. By

earning revenue in excess of the Guaranteed Minimum Amount provided under the recruitment agreement, Dr. Arreola paid what he owed to GSA as indemnification. *See Potts*, 415 A.2d at 1221. To conclude otherwise would lead to an absurd result based on a simple review of the numbers alone – Dr. Arreola's salary during his employment with GSA was $344,000 and he would be responsible for paying $209,699.76 to cover the loan that GSA received from UPMC Horizon despite the fact that he brought into GSA over $700,000 in revenue. *See* Plaintiff's Exhibit 5 (Dr. Arreola's Receipt); N.T., 2/28/11, at 55.

GSA's "cash flow" does not weigh into this decision at all. *See* Trial Court Opinion, 4/5/12, at 10, 14. To the contrary, the record reflects that Dr. Arreola met his obligation to GSA as set forth in the employment contract by generating revenue in excess of the Guaranteed Minimum Amount, thus indemnifying GSA for the money it received from UPMC Horizon to support Dr. Arreola's employment. That GSA allocated the revenue Dr. Arreola generated to other sources – again, a decision over which Dr. Arreola had no control – does not render Dr. Arreola liable for the cost of the loan. GSA's ultimate repayment to UPMC Horizon for the loan provided pursuant to the recruitment agreement does not constitute additional "indebtedness, liabilities, costs, damages or other losses" for which Dr. Arreola was liable pursuant to the employment contract. *See* Plaintiff's Exhibit 2 (Employment Contract), ¶ 15(b). He repaid GSA by

earning revenue in excess of the guaranteed amount, and therefore satisfied his indemnification obligation.

We further agree with Dr. Arreola that the trial court inappropriately awarded damages for costs incurred by GSA in excess of those contemplated in Exhibit C to the recruitment agreement. **See** Dr. Arreola's Brief at 33. The plain language of the employment contract only holds Dr. Arreola responsible for "indebtedness, liabilities, costs, damages or other losses **under the Recruitment Agreement**[.]" Plaintiff's Exhibit 2 (Employment Contract), ¶ 15(b) (emphasis added). Exhibit C to the recruitment agreement sets forth the annual practice expenses covered under the recruitment agreement, the costs for which totaled $300,000 in the first year and $324,000 in the second year, or $25,000 per month in the first year and $27,000 per month in the second year. Plaintiff's Exhibit 1 (Recruitment Agreement), ¶ 5 & Exhibit C. Both Dr. Arreola and GSA were aware of these amounts prior to entering into the employment contract and the plain language of the employment contract only holds Dr. Arreola responsible for the amounts included in the recruitment agreement. Indeed, the record reflects that GSA requested the inclusion of additional anticipated costs in Exhibit C, such as money for the purchase of a new computer system that Dr. Kolenich had already been considering purchasing, but UPMC Horizon did not agree to include any other expenses. N.T., 2/28/11,

at 83; Plaintiff's Exhibit 14 (Letter from Dr. Kolenich to Dave D'Urso of UPMC Horizon).

We recognize that Attorney Ruthanne Beighley, the drafter of the employment contract, testified that she intended the language in paragraph 15(b) of the employment contract "to cover losses associated with the employment of [Dr. Arreola]," not specifically limited to those amounts listed in Exhibit C to the recruitment agreement. **See** Plaintiff's Exhibit 17 (Ruthanne Beighley Deposition), at 21. We also acknowledge that GSA's expert, Robert Sherbondy, testified that losses incurred by GSA of $182,761 during Dr. Arreola's tenure with GSA were "directly related to the employment of [Dr. Arreola]." **See** Plaintiff's Exhibit 3 (Robert Sherbondy Deposition), at 35-36. We conclude, however, that the terms of paragraph 15(b) of the employment contract are clear and unambiguous: Dr. Arreola agreed only to indemnify and hold GSA harmless for the amounts included in the recruitment agreement. Thus, as a matter of law, we may only consider the contractual terms without reference to evidence provided outside of the contract, rendering the testimony concerning the losses GSA incurred outside of the amounts included in Exhibit C to the recruitment agreement irrelevant. **See Bair**, 108 A.3d at 96 (noting our de novo standard of review and plenary scope of review for questions of contract interpretation); **Lesko v. Frankford Hosp.-Bucks Cnty.**, 15 A.3d 337, 342 (Pa. 2011) ("The meaning of an unambiguous contract presents a question of law[.]"); **see**

*also Lenau*, 102 A.3d at 429 ("When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself.").

Based on the foregoing, we conclude that the trial court erred as a matter of law by awarding damages to GSA for amounts it paid to UPMC Horizon under the recruitment agreement and for losses it sustained above those amounts included in the recruitment agreement during Dr. Arreola's term of employment. Reimbursement to GSA by Dr. Arreola for payments GSA made on the loans from UPMC Horizon, under the circumstances of this case, was unreasonable, and the payments for expenses not included in Exhibit C to the recruitment agreement were outside the scope of and not covered by the employment contract's indemnification agreement. *See McClure*, 585 A.2d at 22. We therefore reverse the trial court's decision and remand for the entry of judgment in favor of Dr. Arreola.

Judgment reversed. Motion to quash denied. Case remanded with instructions. Jurisdiction relinquished.

Ford Elliott, P.J.E. joins the Memorandum.

Allen, J. files a Dissenting Memorandum.

J-A01034-15

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2015