J-A01034-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| GREENVILLE SURGICAL ASSOCIATES, P.C., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RODOLFO ARREOLA, M.D., | |
| Appellant | No. 678 WDA 2014 AND |

Appeal from the Judgment entered April 7, 2014,
in the Court of Common Pleas of Erie County,
Civil Division, at No(s): 14153-2004

| | |
|---|---|
| GREENVILLE SURGICAL ASSOCIATES, P.C., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RODOLFO ARREOLA, M.D., | |
| Appellant | No. 737 WDA 2014 |

Appeal from the Order dated April 22, 2014,
in the Court of Common Pleas of Erie County,
Civil Division, at No(s): 14153-2004

BEFORE:  FORD ELLIOTT, P.J.E., DONOHUE, and ALLEN, JJ.

DISSENTING MEMORANDUM BY ALLEN, J.:          **FILED JULY 8, 2015**

I respectfully dissent from the Majority's reversal of the judgment which the trial court had entered in favor of GSA and against Dr. Rodolfo Arreola, M.D., ("Appellant").  The Majority's entry of judgment in favor of

Appellant has effectively granted Appellant a JNOV. It is well settled that our "standard of review prescribes the degree of scrutiny we apply to the trial court's decision and the manner in which we evaluate its conclusions." *Egan, et al. v. USI Mid-Atlantic, Inc., et al.,* 92 A.3d 1, 12 (Pa. Super. 2014). In *Egan*, we reiterated:

> A JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Egan,* 92 A.3d at 19-20. I do not find that this stringent standard is met here.

The trial court detailed its factual findings in pertinent part as follows:

**THE PARTIES**

[] [Appellant] is currently a general surgeon residing and practicing in Erie, Pennsylvania at UPMC Hamot. [Appellant] resigned from GSA in order to obtain employment at Hamot, now UPMC Hamot.

**RECRUITMENT OF [APPELLANT]**

- 2 -

[] UPMC Horizon agreed to make a financial commitment to expand GSA based upon the commitment of [Appellant] to be employed by GSA and to provide ongoing services in the UPMC Horizon, Greenville, Pennsylvania service area on a long-term basis. On or about July 30, 2001, three agreements were reached by several parties.

**THE RECRUITMENT AGREEMENT**

GSA, [Appellant,] and UPMC Horizon entered into a written Recruitment Agreement. The terms of the Recruitment Agreement were dictated by UPMC Horizon. GSA attempted to make minor modifications, however, the substantive terms of the Recruitment Agreement were "immutable." …

[Under Section 7, the Recruitment Agreement contained] loan forgiveness provisions [which] conditioned the forgiveness upon [Appellant] maintaining an active practice in the UPMC Horizon, Greenville, Pennsylvania service area for at least six years. The provision did not require [Appellant] to continue employment with GSA for the entire six-year period only that [Appellant] practice in or around Greenville, Pennsylvania at UPMC Horizon. Furthermore, the Employment Contract [*see infra*] did not contain a restrictive covenant between GSA and [Appellant] which would have prevented [Appellant] from practicing in the UPMC Horizon service area following his resignation from GSA.

The Recruitment Agreement controls the amount of the excess income reimbursement requirement, but places no limitation on the indemnity provisions of the Employment Contract. []

**THE PROMISSORY NOTE**

GSA and [Appellant] entered into a Promissory Note, the terms of which were dictated by UPMC Horizon, in conjunction with the Recruitment Agreement. GSA, through its counsel, attempted to make [Appellant's] liability for repayment primary, however, UPMC Horizon refused to include the changes requested by GSA.

**THE EMPLOYMENT CONTRACT**

GSA and [Appellant] entered into a written Employment Contract. Attorney Ruthanne Beighley ("Attorney Beighley"), counsel for GSA, prepared the initial draft of the Employment

Contract, which was strictly a document between GSA and [Appellant]. When the agreement was negotiated, GSA had only one physician, Dr. Kolenich, and GSA had significant financial limitations. All financial risks assumed under the Recruitment Agreement required mitigation. Therefore, GSA drafted the Employment Contract to provide for the security and indemnity of GSA.

Employment Contract Sections 15(b) and (c) place ultimate responsibility upon [Appellant] for all indebtedness, liabilities, costs, damages or other losses incurred by GSA as a result of the Recruitment Agreement. The sections state:

(b) [Appellant] expressly agrees to indemnify and hold [GSA] harmless from and against any indebtedness, liabilities, costs, damages or other losses under the Recruitment Agreement with UPMC Horizon (the "Recruitment Agreement") or the Promissory Note attached to such Recruitment Agreement as Exhibit A thereto.

(c) The terms of this Section 15 shall survive the termination of this Agreement.

The indemnity provisions of the Employment Contract are written in plain English. [Appellant] had the Employment Contract independently reviewed by an attorney. [Appellant] and his attorney requested no significant changes to the Employment Contract, which was then executed by GSA and [Appellant]. GSA would not have employed or offered employment to [Appellant] if the indemnity provisions of the Employment Contract were not effective.

[Appellant] acknowledged that the indemnity provision included all indebtedness and that the accumulated unpaid excess reimbursement obligation was an indebtedness. The Court did not find credible [Appellant's] understanding that the obligation imposed on him was only to reimburse any shortfall should the total income generated by his efforts not exceed the total budgeted cost, as no provision of the Employment Contract imposes that limitation on [Appellant's] indemnity obligation.

**[APPELLANT'S] EMPLOYMENT AT [GREENVILLE]**

In the summer of 2001, [Appellant] moved to Greenville, Pennsylvania. He began employment at GSA in mid-September

2001, after he secured a Pennsylvania license and hospital credentialing. [Appellant's] employment at GSA was his first private practice job. During the time that [Appellant] was employed at GSA, from mid-September 2001, until September 19, 2003, UPMC Horizon advanced the sum of $184,800.24 to [GSA] pursuant to the Recruitment Agreement. The advancements reimbursed GSA for the costs of [Appellant's] compensation and certain, but not all, expenses incurred related to the employment of [Appellant]. GSA did not receive any income from [Appellant] at GSA until about February 2002.

[Appellant] performed general surgery work and some vascular surgery. However, both Dr. Kolenich and [Appellant] began focusing on bariatric surgery patient recruitment. Due to the concentrated efforts of both Dr. Kolenich and [Appellant], GSA was awarded the "Center of Excellence" designation by the American Society for Bariatric Surgery.

During the course of [Appellant's] employment, expenditures were made to improve GSA. Some of these expenditures permit a second physician to operate in the facility.

[Appellant] requested and required certain expenses in order to practice under his terms at GSA. These expenses were not included in Exhibit C, to include an improved practice computer system, additional examining room(s) so that both physicians could have office hours at the same time which required the facilities to be enlarged, therefore remodeling was conducted, a new desk, substantial GSA staff overtime to accommodate [Appellant's] schedule of office hours, and new office staff. The renovations were necessary and completed during [Appellant's] tenure.

These expenses were in excess of those projected in Exhibit C and were directly related to accommodate [Appellant] and the needs of a two physician practice per Robert C. Sherbondy, CPA, [("Sherbondy")] [GSA's accountant since 1990 and its accounting expert at trial].

In the spring of his second year of employment, [Appellant] discussed the future of the practice with Dr. Kolenich. Dr. Kolenich offered [Appellant] equal ownership of the practice and ownership interest in the real estate. At that time, [Appellant] was supplied with financial documents for GSA, including ten years of reports regarding the performance of the practice.

On June 6, 2003, Dr. Kolenich confirmed the offer via letter to [Appellant], but Dr. Kolenich's letter did not address a firm salary to [Appellant] after September 2003. The letter required [Appellant] to pass his Boards in 2003, rather than 2004, as stated in the Employment Agreement. [Appellant] never presented a counterproposal to Dr. Kolenich or requested a written confirmation of income after September 2003. [Appellant] then drafted a resignation letter which was delivered on July 18, 2003, however, the letter was undated. The letter indicated that [Appellant] intended to terminate his employment with GSA. On July 29, 2003, Dr. Kolenich, on behalf of GSA, responded by letter to [Appellant]. In that letter Dr. Kolenich included the following:

> Lastly, I would like to remind you of the financial obligation you have to UPMC/Horizon per your employment contract with GSA. Specifically, I would refer you to Item 15B in your employment contract with GSA. I am presently asking for an update on that amount from Mr. David Shulik, Financial Officer of UPMC/Horizon. I will provide you with that information prior to your departure from this Practice.

The July 29th letter confirmed the intent of section 15(b) of the Employment Contract, which placed ultimate responsibility upon [Appellant] for all sums advanced by UPMC Horizon. [Appellant] acknowledged that he had advised Michael Downing ("Downing") at UPMC Horizon of his resignation, and that UPMC Horizon had suggested opportunities for him to remain in the UPMC Horizon service area and not work for GSA. Those opportunities were not explored by [Appellant].

### [APPELLANT'S] RESIGNATION

On September 19, 2003, [Appellant's] employment with GSA terminated and he has not practiced within the UPMC Horizon service area. [Appellant] was advised by a patient that Hamot Medical Center (hereinafter "Hamot") was interested in developing a program in bariatrics and [Appellant] entered into negotiations with [Hamot] while still employed by GSA. [Appellant] signed a contract with Hamot in September of 2003, the same month he resigned his privileges at UPMC Horizon and terminated all practice affiliations in the UPMC Horizon service area.

[Appellant] showed the Recruitment Agreement and/or the Employment Contract to Hamot, requested help paying legal fees associated with this litigation, and received and is currently receiving help covering the costs of this litigation, including the costs associated with [Appellant's] accounting, expert consultation and testimony, and [Appellant's] counsel.

**CONSEQUENCES OF [APPELLANT'S] RESIGNATION**

David D'Urso, Director of Physician Recruitment at UPMC Horizon, interpreted the Recruitment Agreement and the Employment Contract. He determined that the monies owed under the Recruitment Agreement would be forgiven if [Appellant] continued to work in the UPMC Horizon service area for the required six years. D'Urso also considered the effect of the indemnity provisions of the Employment Contract upon the obligations imposed under the Recruitment Agreement. He concluded that absent forgiveness, the ultimate responsibility was [Appellant's].

[Appellant's] departure from UPMC Horizon's Greenville service area resulted in the forfeiture of any loan forgiveness under the Recruitment Agreement, forgiveness of the loan repayment obligations. [sic]

GSA was experiencing cash flow problems directly related to the increased costs arising from [Appellant's] employment.

**REPAYMENT UNDER THE RECRUITMENT AGREEMENT**

GSA's cash flow during the employment of [Appellant] was a key component of why GSA failed to make the required payments under the Recruitment Agreement. GSA's accountant, [Sherbondy], analyzed GSA's operating bank account from October 31, 2001 through September 30, 2003. This analysis demonstrated that no excess was generated and no reimbursement was due until July 31, 2002. That excess in the amount of $5,686.00 was paid on August 22, 2002. The next month, August 31, 2002, an excess of $482.00 was generated, which was repaid on September 20, 2002. Thereafter, from September 2002 through September 30, 2003, there was insufficient money in the checking account to pay the reimbursement, and the cumulative total of the overdraft that would have occurred had those payments been made totaled $171,931.00. GSA requested that UPMC Horizon forgive the amounts advanced to GSA, but UPMC Horizon refused. On

October, 15, 2003, UPMC Horizon sent a demand for payment addressed to Dr. Kolenich, [Appellant] and GSA, requesting that GSA and [Appellant] "make arrangements within the next thirty (30) days to repay [UPMC Horizon] the entire monies owed so that we can avoid the necessity for further action over this issue."

UPMC Horizon's demand was ignored by [Appellant]. On December 16, 2003, GSA paid UPMC Horizon the sum of $168,532.01, including interest in the amount of $24,899.52, which, in conjunction with $41,167.75 previously paid by GSA, totaled $209,699.76. This amount fully satisfied the obligation to UPMC Horizon. The payment funds were secured from Dr. and Mrs. Kolenich personally and provided to GSA.

GSA's failure to make payment obligations under the Recruitment Agreement was due to GSA's cash flow shortages. If GSA had made the payments as indicated under the Recruitment Agreement, then GSA would have been required to acquire debt, which under the terms of the Employment Agreement, [Appellant] would have been responsible for.

GSA's delay in payment did not cause the indebtedness at issue and was not material to the indemnity obligation. Furthermore, GSA suffered losses all [attributable] to [Appellant's] employment.

### [GSA'S] LOSSES

[Sherbondy] testified that for the two-year period that [Appellant] was employed at GSA, GSA sustained a loss of $182,761.00 [dollars] and that the loss was directly related to [Appellant's] employment.

Trial Court Opinion, 4/5/12, at 2-11 (some internal footnotes omitted).

Based on my review of the record and applicable jurisprudence, I find that Appellant's first, second and third issues fail. In examining the foregoing issues, I am mindful that "[c]ontract interpretation is a question of law regarding which our standard of review is *de novo* and our scope of

review is plenary." ***McMullen v. Kutz,*** 985 A.2d 769, 773 (Pa. 2009) (internal citation omitted). Significantly, I further recognize:

> Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue … concerns a question of law, our scope of review is plenary.
>
> The trial court's conclusions of law on appeal originating from a non-jury trial 'are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts' of the case.

***Wyatt v. Citizens Bank of Pennsylvania***, 976 A.2d 557, 564 ***citing Wilson v. Transp. Ins. Co.***, 889 A.2d 563, 568 (Pa. Super. 2005) (citations omitted).

Likewise:

> It has been long accepted in contract law that an ambiguous written instrument presents a question of fact for resolution by the finder-of-fact, whereas the meaning of an unambiguous written instrument presents a "question of law" for resolution by the court. As the authorities in the field of contracts make clear, however, the latter exercise is also in actuality a factual, not a legal, decision. For a variety of reasons the common law has long thought it best to leave to the court rather than to the jury the essentially factual question of what the contracting parties intended. This fact finding function exercised by the court is denominated a "question of law", therefore, not because analytically it is a question of law but rather to indicate that it is the trial judge, not the jury, to whom the law assigns the responsibility for deciding the matter.

*Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA)*, 375 A.2d 1267, 1274 (Pa. 1977) (internal citations omitted).

Instantly, Appellant contends that the trial court misinterpreted the Recruitment Agreement, the Promissory Note, and the Employment Contract, and that in doing so and relying on GSA's expert accounting testimony, the trial court erred in determining that Appellant was liable to Greenville pursuant to the foregoing contracts. *See* Appellant's Brief at 15-16. I cannot agree.

Appellant summarizes his challenge to the trial court's interpretation of the Recruitment Agreement as follows:

> The trial court misinterpreted the Recruitment Agreement by finding that [Appellant's] resignation had caused the forfeiture of a loan forgiveness option. The option applies only when [Appellant's] receipts had been insufficient to retire the loan debt. It is undisputed that [Appellant's] receipts were sufficient to retire the entire loan debt. Thus, no amounts were subject to forgiveness. Even if the loans had been subject to forgiveness, the court erred by finding that [Appellant's] resignation breached a requirement that he practice within [UPMC Horizon's] service area. [Appellant] had satisfied the forgiveness provision mandate that he maintain a local practice for 2 years. Moreover, [GSA's] own defaults in payment to the [UPMC Horizon] would have caused a forfeiture of the forgiveness option. Also, the court misread the forgiveness option to award [GSA] all of the loans that it had repaid to [UPMC Horizon], including those that had been repaid before [Appellant's] resignation.

Appellant's Brief at 15-16.

"[T]he mutual intention of the parties at the time they formed the contract governs its interpretation. Such intent is to be inferred from the written provisions of the contract." **Miller v. Poole,** 45 A.3d 1143, 1146 (Pa. Super. 2012) (internal citation omitted). Appellant concedes that "[u]nder paragraph 5 of the Recruitment Agreement, [UPMC] agreed to loan GSA money to off-set **start-up costs** arising **during the first two** years of [Appellant's] employment[.]" Appellant's Brief at 8 (emphasis supplied). Appellant's statement reflects that the Recruitment Agreement specifically required Appellant to work for UPMC Horizon for more than the initial two year time frame, during which loans were to be furnished to GSA on Appellant's behalf by UPMC Horizon.

The Recruitment Agreement expressly indicated that UPMC Horizon "desires **to offer [Appellant] certain initial guarantees** in connection with providing Services in [UPMC Horizon's] Service Area which will include participating in [UPMC Horizon's] Department of Surgery." Recruitment Agreement, 7/30/01, at 1. The Recruitment Agreement further indicated that UPMC Horizon's "Board of Directors has fully considered **the need for physicians that provide Services in [UPMC Horizon's] Service Area**, has approved [UPMC Horizon's] extending an offer of initial income guarantees to [Appellant] and has determined that said assistance is reasonable and necessary to maintain and improve health care in [UPMC Horizon's] Service Area[.]" *Id.* at 2. The Recruitment Agreement defined "Service Area" as "in and around Mercer County, Pennsylvania." *Id.* at 1.

The Recruitment Agreement further provided:

[I]n consideration of the mutual promises and agreements contained herein, the parties hereto, **intending to be legally bound** hereby, agree as follows:

\*\*\*

2. **Commencing on or before the Start Date and continuing throughout the term of this Agreement, [Appellant] shall practice medicine on a full-time basis in [UPMC Horizon's] Service Area and outlying communities,** excluding any other employment or professional duties, as are usual and customary in the area of [Appellant's] specialty.

3. **[Appellant] shall become and remain a member of the active Medical Staff of [UPMC Horizon] throughout the term of this Agreement**.

*Id*. at 2 (emphasis supplied).

Regarding loans, the Recruitment Agreement stated:

5. **During the first two years** of this Agreement, [UPMC Horizon] **shall advance [GSA] on behalf of [Appellant]** on a monthly basis, sums of money to guarantee that for **the first two years of [Appellant's] practice** at [UPMC Horizon] ("Guarantee Period"), [Appellant] receives actual cash receipts equal to $300,000 in the first year of the Guarantee Period and $324,000 in the second year of the Guarantee Period.

\*\*\*

7. **Notwithstanding the above, as an alternative means of repayment,** [UPMC Horizon] agrees that the Net Amount advanced by [UPMC Horizon] under Section 6, subject to Paybacks and obligated to be repaid to [UPMC Horizon] under Section 6, shall be forgiven and the Note executed as of such date shall be canceled **if, at all relevant times up until and throughout the Guarantee End Date, [Appellant] and [GSA] have met (as applicable) all of the following requirements**:

    (a) **[Appellant] shall have engaged in the full-time practice of General Surgery in [UPMC Horizon's]**

**Service Area at [UPMC Horizon] and made services available to the public in accordance with the provisions of this Agreement;**

(b) **[Appellant] shall have worked a normal work week** as is customary for physicians in the area who practice in [Appellant's] specialty unless unable to do so due to disability;

\*\*\*

(f) **[Appellant] shall have assisted [UPMC Horizon] in its educational programs as may be reasonably requested by Hospital;**

(g) **[Appellant] shall have participated in a call coverage arrangement, irrespective of the patient's ability to pay**;

(h) **Subject to also fulfilling his other duties hereunder, [Appellant] shall have assisted [UPMC Horizon] in the development of community services as may be reasonably requested by [UPMC Horizon], and**

(i) **[Appellant] and [GSA] shall have otherwise satisfied all of his/its obligations under this Agreement**.

*Id.* at 3-5 (emphasis supplied).  It is clear that the emphasis of the Recruitment Agreement was to secure, promote, and incentivize the recruitment, employment, and continued services of Appellant for a six year term.

Appellant contends that GSA materially breached the Recruitment Agreement by failing to remit timely paybacks to UPMC Horizon during the guarantee period, and that said breach, rather than Appellant's resignation, is the reason for GSA's indebtedness to UPMC Horizon, the forfeiture of loan

forgiveness, and GSA's operating losses, such that Appellant should be relieved of any liability in connection thereto.

My review of the record supports the trial court's rebuttal of the foregoing contention. The trial court observed, "GSA's cash flow during the employment of [Appellant] was a key component of why GSA failed to make the required payments under the Recruitment Agreement." Trial Court Opinion, 4/5/12, at 10. The trial court reasoned:

> GSA did not commit a material breach of its obligations to [Appellant] resulting from the delay in repayment of the UPMC Horizon obligation. The Court finds it was not financially feasible for GSA to make the paybacks to UPMC Horizon during the term of [Appellant's] employment through September 30, 2003, and finds that the excess income reimbursement payments, if made, would have resulted in an overdraft or cash deficiency of $171,931.00. Therefore, an infusion of $171,931.00 of additional cash would have been necessary to make those payments.
>
> Rather this Court finds that GSA complied with all facets of the agreement. GSA's failure to pay the excess monies back before [Appellant] resigned was not a material breach. The Recruitment Agreement contained no time is of the essence clause so GSA's failure to perform on a certain date was not a material breach. '[A] material failure to perform or to offer to perform on a stated day does not of itself discharge the other party's remaining duties unless the circumstances, including the language of the agreement, indicate that performance or an offer to perform by that day is important.' Restatement (Second) of Contracts, § 242(c).

Trial Court Opinion, 4/5/12, at 14.

Conversely, the trial court determined:

[Appellant], however, willingly breached the contracts to the detriment of GSA. [Appellant] materially breached the

- 14 -

obligations imposed upon him by the Recruitment Agreement by failing to:

a) maintain a medical practice in the UPMC Horizon service area for six years;

b) maintain a practice presence in the UPMC Horizon service area after September 2003, causing both GSA and [Appellant] to lose the loan forgiveness from UPMC Horizon; and

c) respond and make any effort to satisfy the request for payment submitted to both [Appellant] and GSA on October 15, 2003 by UPMC Horizon.

***

It is clear to this Court that all parties understood and recognized the foreseeable risks inherent in the Recruitment Agreement. The Court rejects [Appellant's] explanations and understanding of the contracts. [Appellant] voluntarily and knowingly moved to Greenville, entered into the Employment Contract and Promissory Note and committed to the length of the Recruitment Agreement, six (6) years. [Appellant] moved away from the Greenville service area because he and his wife were dissatisfied with the Greenville area and because he had an opportunity to practice at a larger medical facility.

[Appellant] acted in bad faith towards GSA. 'The extent to which the behavior of the party failing to perform or to offer to perform comports with the standards of good faith and fair dealing is a significant circumstance in determining whether the failure i[s] material. In giving weight to this factor, courts have often used the term willful.' Restatement(Second) of Contracts, § 241 comment f. [Appellant's] actions were clearly willful. Furthermore, 'a claim for damages for total breach is one for damages based on all of the injured parties' remaining rights to performance.' Restatement (Second) of Contracts, § 235. [GSA] is entitled to reimbursement for the entire amount of the loan repaid to UPMC Horizon under the Recruitment Agreement as it is undoubtedly an indebtedness considered under Section 15(b) of the Employment Contract.

Trial Court Opinion, 4/5/12, at 14-16.

My review of the Recruitment Agreement and applicable jurisprudence supports the trial court's determinations. Our Court has explained:

> When performance of a duty under a contract is due, any nonperformance is a breach. *Widmer Engineering, Inc. v. Dufalla,* 837 A.2d 459, 467–468 (Pa. Super. 2003). If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party. *LJL Transp., Inc. v. Pilot Air Freight Corp.,* 599 Pa. 546, 962 A.2d 639, 648 (2009). Conversely, a party might breach the contract but still substantially perform its obligations under the agreement. *Cimina v. Bronich,* 517 Pa. 378, 537 A.2d 1355, 1358 (1988). In that case, the breach is deemed nonmaterial and the contract remains in effect. *Id.* The breaching party retains the right to enforce the contract and demand performance; the nonbreaching party has no right to suspend performance. *Widmer Engineering, Inc.,* 837 A.2d at 468.

**McCausland v. Wagner,** 78 A.3d 1093, 1101 (Pa. Super. 2013).

Moreover, our Supreme Court has determined:

> [I]t is well-established that 'only material failure of performance by one party discharges the other party ... an immaterial failure does not operate as such a discharge.' *Sgarlat v. Griffith,* 349 Pa. 42, 46, 36 A.2d 330, 332 (1944) (citing Restatement of Contracts § 274 (1932)); *See First Mortgage Co. of Pa. v. Carter,* 306 Pa.Super. 498, 452 A.2d 835 (1982); *Greentree Borough v. Tortorete,* 205 Pa.Super. 532, 211 A.2d 76 (1965).

> In this regard it has been said that:

> Any material failure of performance by one party to a contract not justified by the conduct of the other discharges the latter's duty to give the agreed exchange; but if the alleged breach was an immaterial failure of performance, and the contract was substantially performed, the provisions of the contract are still effective.

> P.L.E. Contracts § 367 (footnotes omitted).

***Cimini v. Bronich,*** 537 A.2d 1355, 1358 (Pa. 1988).

Additionally, our Court has expressed:

> In determining materiality for purposes of breaching a contract, we consider the following factors:
>
> a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;
>
> c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
>
> e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.
>
> Restatement (Second) of Contracts § 241 (1981). *Accord Jennings v. League of Civic Organizations of Erie County,* 180 Pa.Super. 398, 119 A.2d 608 (1956).
>
> *Id*. at 471.

***Widmer Engineering Inc. v. Dufalla,*** 837 A.2d 459, 467-468 (Pa. Super. 2003).  In affirming the trial court's finding of no material breach, our Court reasoned:

> [T]he trial court concluded in its well-reasoned opinion that despite seller's failure to pay monies due and owing under the contract, '[buyer] was not deprived of the benefit [it] reasonably expected, i.e., the purchase of an engineering firm.'  Thus, the trial court held that seller's breach was not material and that buyer was obligated to continue its payments under the non-compete provision of the agreement.

In considering the relevant factors outlined above, we find no error in the court's conclusion that seller's breach was not a material breach. Simply put, despite seller's failure to pay taxes and amounts owed as adjustments to purchase price, buyer retained ownership and operational control of Engelhardt which generated gross income for buyer in excess of $600,000 during every year after acquisition. Clearly, buyer was not deprived of the benefit of ownership of the firm. Further, we conclude that any benefit of which buyer was deprived as a result of seller's contractual breach was adequately compensable by the award of monetary damages.

Moreover, if buyer's non-performance under the remainder of the contract were to be excused, then seller would forfeit a substantial portion of the monies due him under the agreement of sale vis-à-vis its non-compete provision. Weighing these consequences, we conclude that the degree of seller's breach was not such that buyer's obligations for payment under the contract may be suspended. The contract was substantially performed by seller who delivered all his shares and relinquished control of Engelhardt. Accordingly, we conclude that the court properly found buyer's obligations for payment under the contract's non-compete provisions to be enforceable and we reject buyer's claim that the court erred in awarding seller interest at the rate specified in the contract for monies due under the non-compete clause.

*Id.* at 468-469 (footnote omitted).

Instantly, even if GSA's untimely paybacks breached the Recruitment Agreement, GSA still substantially performed the contract. GSA employed Appellant, paid Appellant's salary, submitted various paybacks during the guarantee period, and ultimately paid the total outstanding amount plus interest once the monies were demanded by UPMC Horizon. UPMC Horizon did not lose the benefit of its bargain with GSA and Appellant due to the untimeliness of any paybacks for which GSA paid interest and satisfied in full. Appellant did not lose the benefit of his bargain because GSA's untimely

- 18 -

paybacks did not deprive Appellant of his recruitment, employment, salary, and income guarantees which were the emphasis of the Recruitment Agreement. Further, as the trial court noted *infra*, the timing of the paybacks was not cited by UPMC Horizon's representatives as the cause for the loss of the loan forgiveness, such that Appellant can claim that GSA's breach deprived him of that benefit. Accordingly, GSA's breach may be deemed nonmaterial such that GSA can still seek to enforce the Recruitment Agreement and the related agreements.

Conversely, Appellant is not a non-breaching party who is relieved from any obligation to perform under the Recruitment Agreement. Appellant materially breached the Recruitment Agreement upon his resignation from GSA after two years, followed by his departure from UPMC Horizon's service area. Appellant's resignation and departure deprived GSA and UPMC Horizon of the benefit of their bargain, which was to employ Appellant as a second surgeon to help expand GSA's bariatric surgery services. Accordingly, I find that the trial court correctly considered the materiality of the parties' breaches.

Moreover, the trial court's determination is consonant with our Court's jurisprudence regarding conditions precedent. "A condition precedent may be defined as a condition which must occur before a duty to perform under a contract arises." ***Acme Markets, Inc. v. Federal Armored Express, Inc.***, 648 A.2d 1218, 1221-1223 (Pa. Super. 1994) (internal citation omitted). Here, Appellant contends that loan forgiveness by UPMC Horizon was

conditioned on GSA's timely remittance of paybacks, and that GSA's failure to remit the paybacks in a timely fashion caused forfeiture of the debt's cancellation. I recognize that "[w]hile the parties to a contract need not utilize any particular words to create a condition precedent, an act or event designated in a contract will not be construed as constituting one unless that clearly appears to have been the parties' intention." **Id**. In **Acme**, our Court explained:

> Restatement (Second) of Contracts § 229 discusses the excuse of a condition to avoid unfairness in connection with its strict enforcement. More specifically, that section relates to the excuse of a condition leading to a forfeiture[.] [] Section 229 provides, 'To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.' Restatement (Second) of Contracts § 229. Since Pennsylvania law 'abhors forfeitures and penalties and enforces them with the greatest reluctance when a proper case is presented[,]' *Fogel Refrigerator Co. v. Oteri,* 391 Pa. 188, 195, 137 A.2d 225, 231 (1958), section 229 is consistent with the law of this Commonwealth. *See also Jackson v. Richards*, *5 & 10, Inc.,* 289 Pa. Super. 445, 433 A.2d 888 (1981) (indicating that forfeitures meet with great disfavor under the law and utilizing a discussion of a tentative Restatement draft to excuse performance on an express condition).

> > In determining whether the forfeiture is 'disproportionate,' [the] court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the nonoccurrence of the condition is excused to the extent required to prevent forfeiture.

> Restatement (Second) of Contracts § 229, comment b.

*Acme Markets, Inc. v. Federal Armored Express, Inc.*, 648 A.2d at 1221-1223.

Here, it would be "disproportionate" to deem GSA's late payments as the cause of the forfeiture of loan forgiveness. While the late payment may have been a technical breach, and even assuming without deciding that it was a material breach, the Recruitment Agreement provided for interest on the outstanding monies, which would protect UPMC Horizon from any prejudice suffered due to GSA's late performance of the contractual duty to remit paybacks. Thus, GSA's late payments could be excused to avoid forfeiture. Conversely, forfeiture would not be "disproportionate" to protect UPMC Horizon from Appellant's resignation from GSA, and his total abandonment of the service area.

Appellant further challenges the trial court's analysis of the Promissory Note, which referenced contribution principles to conclude that Appellant was liable to GSA pursuant to the Promissory Note for half of the monies paid to UPMC by GSA. **See** Appellant's Brief at 26-27. However, this challenge fails because the trial court did not calculate the damages awarded to GSA based on contribution principles, but rather on the trial court's finding that "[Appellant] [was] responsible for the entirety of the indebtedness[.]" **See** Trial Court Opinion, 4/5/12, at 13 n.4.

Nevertheless, Appellant mischaracterizes his execution of the Promissory Note as an "accommodating party," who "signs the instrument for the purpose of incurring liability on the instrument without being a direct

- 21 -

beneficiary of the value given for the instrument[.]" Appellant's Brief at 27. Appellant discounts that he *directly* benefitted from the monies issued to GSA. As cited above, the Recruitment Agreement provided that the monies UPMC Horizon furnished to GSA were paid on behalf of Appellant, were to serve as set-offs for the start-up costs related to Appellant's employment, and were guarantees for Appellant's salary. Therefore, I reject Appellant's assertion that he is "an accommodating party" who can avoid the Promissory Note.

The trial court determined that pursuant to the Promissory Note, Appellant was liable to GSA. The trial court explained:

> [] The promissory note was signed by [Appellant] and [Greenville]. It requires both parties to be liable to UPMC Horizon for the amounts payable under the Recruitment Agreement, $209,699.76. []
>
> ***
>
> Since [Appellant] failed to satisfy the requirements of the Recruitment Agreement to allow forgiveness of the loans made to GSA from UPMC Horizon, UPMC Horizon was entitled to the amounts due and payable under the terms of the Recruitment Agreement. [Appellant's] actions were detrimental to GSA. GSA could not seek forgiveness and the loan repayments were accelerated. GSA paid the entirety of the amount due and payable, $209,699.76. It was foreseeable to [Appellant], as he had read and understood the Recruitment Agreement, that if he failed to remain and provide medical services within the UPMC Horizon service area for six years that all of the loan monies would be due and payable immediately and that all forgiveness opportunities would be lost.
>
> 'A contracting party is generally expected to take account of these risks that are foreseeable at the time he makes the contract.' Restatement (Second) Contracts, § 351 comment a.

'A party is liable only for those damages that a reasonable man would expect to follow the breach of a particular contract . . . unless it is shown specifically that the defendant had reason to know of the circumstances responsible for the special damage and so to foresee the injury.' Ebasco Services, Inc. v. Pennsylvania Power and Light Co., 460 F. Supp. 163, 217 (E.D. Pa. 1978) citing Hadley v. Baxendale, 156 Eng.Rep. 145 (1854). [Appellant] could clearly foresee the repayment of the loans and, is responsible … to [Greenville][.]

Trial Court Opinion, 4/5/12, at 12-13. Based on my review of the record and applicable jurisprudence, I find that the trial court correctly determined that based on a plain reading of the Promissory Note, Appellant and GSA clearly intended to be, and therefore were, individually obligated to repay UPMC Horizon's loans.

As to the Employment Contract, the trial court found that "[Appellant] materially breached Section 15(b) of the Employment Contract by his failure to honor the indemnity obligations." Trial Court Opinion, 4/5/12, at 13. Appellant summarizes his challenge to the trial court's interpretation of the Employment Contract, and argues that GSA's "repayment of the loans is not a *loss* and, thus, it was not covered by the indemnity provision of the Employment Contract. Also the indemnity obligation does not cover all of GSA's financial losses, or losses that were not caused by [Appellant]." Appellant's Brief at 16. Based on my review of the Employment Contract, I disagree.

The Employment Contract provided in pertinent part:

[Appellant] expressly agrees to indemnify and hold [GSA] harmless **from and against any indebtedness, liabilities, costs, damages, or other losses under the Recruitment**

- 23 -

**Agreement with UPMC Horizon ... or the Promissory Note** attached to such Recruitment Agreement as Exhibit A thereto.

Employment Contract, Section 15(b) (emphasis supplied). I cannot ignore that the Employment Contract specifically referenced the Recruitment Agreement and the Promissory Note, and that those contracts required the repayments of the UPMC Loans plus interest. To do so would contravene contract interpretation principles. Our Court recently observed:

> It is a general rule of law in the Commonwealth that where a contract refers to and incorporates the provisions of another, both shall be construed together. It is well-settled that clauses in a contract should not be read as independent agreements thrown together without consideration of their combined effects. Terms in one section of the contract, therefore, should never be interpreted in a manner which nullifies other terms in the same agreement. Furthermore, the specific controls the general when interpreting a contract.

> *Trombetta v. Raymond James Financial Services, Inc.,* 907 A.2d 550, 560 (Pa.Super.2006) (citations omitted). 'It is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole.' *Shehadi v. Northeastern Nat. Bank of Pennsylvania,* 474 Pa. 232, 378 A.2d 304, 306 (1977). 'Where several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the other; and this is so although the instruments may have been executed at different times and do not in terms refer to each other.' *Huegel v. Mifflin Const. Co., Inc.,* 796 A.2d 350, 354–355 (Pa.Super.2002), *quoting Neville v. Scott,* 182 Pa.Super. 448, 127 A.2d 755, 757 (1957).

*Southwestern Energy Production Co. v. Forest Resources, LLC,* 83 A.3d 177, 187 (Pa. Super. 2013).

Accordingly, I do not agree with Appellant's interpretation of the terms "indebtedness" or "other losses" (*see* Appellant's Brief at 32), as disallowing the items of damages raised in this action, and which are borne by a reading *in pare materia* of the Employment Contract, the Recruitment Agreement and the Promissory Note. "[C]ontractual clauses must be construed, whenever possible, in a manner that effectuates all of the clauses being considered. It is fundamental that one part of a contract cannot be so interpreted as to annul another part and that writings which comprise an agreement must be interpreted as a whole." **Lenau, et al. v. Co-Exprise, Inc.,** 102 A.3d 423, 430 (Pa. Super. 2014) (internal citations omitted).

In **Lenau**, our Court concurred with the trial court's interpretation of a contract provision and affirmed the trial court's order granting preliminary objections in the nature of a demurrer, and observed that the appellant's argument "[b]y focusing solely upon the meaning of [a section of the disputed contract], … engages in the exact type of limited interpretation that our governing precedent forbids." **Id**. at 431 (internal citation omitted). Our Court reiterated that "[t]his Court's consideration of contracts must seek to give full effect to an entire document, if possible, and not only those portions supporting a specific conclusion. Mere disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity." **Id**. (internal citation and quotations omitted). Here, to adopt Appellant's interpretation of "indebtedness" or "other losses" under the Employment Agreement as disallowing the damages

awarded in this action would "engage in the exact type of limited interpretation that our governing precedent forbids." ***Id.***

Indeed, as the trial court explained:

[] [Appellant] is responsible to GSA for any other losses that were sustained by GSA as a result of GSA's employment of [Appellant] and [Appellant's] breach of the employment contract. GSA established $182,761 [dollars] in losses through the analysis and testimony of [Sherbondy]. Losses are a distinct recoverable amount under Section 15(b). 'Ordinarily, when a court concludes that there has been a breach of contract, it enforces the broken promise by protecting the expectation that the injured party had when he made the contract. It does this by attempting to put him in as good a position as he would have been in had the contract been performed, that is, had there been no breach.' Restatement (Second) of Contracts, § 344 comment a.

This Court finds that the losses alleged by GSA as a result of [Appellant's] employment were $182,761.00 and are reasonable and well-supported by the evidence of record. [FN5: Under the [] analysis [of Appellant's accounting expert], the maximum conceivable disputed losses are $73,174.93. Therefore, even if those losses were deducted from the losses claimed by GSA, the remaining adjusted loss is $109,586.07, meaning that GSA sustained a loss as a result of [Appellant's] employment, of which [Appellant] is responsible.]

Trial Court Opinion, 4/5/12, at 16.

Appellant admitted that his employment with GSA was his first employment in private practice. N.T., 3/1/11, at 16. Appellant understood that there would be "additional costs that the practice would incur because of [his] presence … and that [he was] going to be responsible to pay them back[.]" ***Id.*** The trial court observed that Appellant "had the Employment Contract independently reviewed by an attorney. [Appellant] and his

- 26 -

attorney requested no significant changes to the Employment Contract, which was then executed by GSA and [Appellant]." Trial Court Opinion, 4/5/12, at 6. Appellant entered into the Employment Contract volitionally, and has not set forth any grounds which would indicate that he was defrauded or coerced into the Employment Contract such that he could disavow it. As noted in **Miller v. Ginsberg,** 874 A.2d 93 (Pa. Super. 2005):

> The fundamental rule in construing a contract is to ascertain and give effect to the intention of the parties. Thus, we will adopt an interpretation which, under all circumstances, ascribes the most reasonable, probable, and natural conduct of the parties, bearing in mind the objects manifestly to be accomplished. Additionally, if the language appearing in the written agreement is clear and unambiguous, the parties' intent must be discerned solely from the plain meaning of the words used*.* **Moreover, we may not ignore otherwise clear language merely because one of the parties did not anticipate related complications prior to performance***.*

**Miller**, 874 A.2d at 99 (emphasis supplied, internal citations and quotations omitted).

Moreover:

> When persons are negotiating, no matter for what purpose, there comes a moment of grave determination when minds meet in complete accord, entire harmony and thorough understanding, and when that moment is solemnized with ink, handshake or appropriate words or action, a covenant is formed which cannot be dissevered with legal approbation.

**Di Pompeo v. Preston,** 123 A.2d 671, 674 (Pa. 1956). Accordingly, I find that the trial court correctly interpreted the Employment Contract, and that Appellant is obligated by the terms to which he agreed.

Having found that the trial court's interpretation of the Recruitment Agreement, Promissory Note, and Employment Contract is supported by those contracts, I turn to the trial court's determination of the damages it awarded to GSA. The trial court credited the expert accounting testimony of Sherbondy, GSA's expert, over the testimony of Schaffner, Appellant's expert. I recognize that while contract interpretation is a question of law and we are not bound by the trial court's legal conclusions, "we are bound by the trial court's credibility determinations." *See Calabrese v. Zeager*, 976 A.2d 1151, 1154 (Pa. Super. 2009).

Here, the trial court recognized that Appellant's accounting expert "disputed the accuracy of Sherbondy's loss determination, concluding that you could not make that loss determination or quantify that loss, without accrual basis adjustments to payables and receivables, [but Schaffner] could not express the opinion that no loss occurred." Trial Court Opinion, 4/5/12, at 11 n.3.

Sherbondy testified that "since 1990" he had completed GSA's tax returns, financial statements, as well as "statements for any banking institutions that may have been involved." N.T., 2/28/11, at 6-7; 11. Sherbondy's expert accounting opinions were summarized as follows: 1) "the loss [to GSA] for the fiscal years 2002 and 2003, which was the term of [Appellant's] employment with GSA, was $182,761 [dollars]"; 2) "the loss [was] directly related to the employment of [Appellant] under the recruitment agreement"; and 3) "GSA did not have the ability to pay

reimbursement of the excess collected over the monthly guarantee amount during the period of [Appellant's] employment." *Id.* at 7.

In opining that GSA had sustained a loss of $182,761 dollars, Sherbondy's expert report "modif[ied] previously submitted accounting statements" for GSA which had treated "advances by UPMC as income." *Id.* at 8. Sherbondy's report modified the prior financial statements for GSA for 2002 and 2003 by "deleting all advances [from UPMC] and all payments back to … UPMC" to reflect GSA's "profit or loss … without the recruitment agreement … at least on the income and expense statement." *Id.* at 9.

Sherbondy testified that he reviewed an affidavit from Schaffner, Appellant's accounting expert, which criticized Sherbondy's treatment of the UPMC advances as income. *See id.* at 7-8. Sherbondy explained that he "treat[ed] loan proceeds [from UPMC] as income", based on his prior "experience with several other doctors' offices in our area." *Id.* at 8. "[I]n all cases, none of those loans were completely paid … [a]nd there had been forgiveness in each of the other transactions." *Id.* at 8-9. In treating the advances as income, the "intent was to level out the income over the period of the loan rather than to see the doctor saddled with a large tax liability at the end by receiving a 1099 at the end of the term for forgiveness of a debt[, which would then] be taxable income at the time of forgiveness." *Id.*

Schaffner additionally criticized Sherbondy's "use of income tax accounting as opposed to … GAAP or Generally Accepted Accounting Practices[.]" *Id.* at 9. Sherbondy explained that "income tax basis of

accounting is based on the income tax filings of the individual or shareholder of the corporation. Generally Accepted Accounting Pr[inciples] or GAAP is probably a more detailed method of accounting where you account for other things like receivables, payables, … that you would not account for on the income tax basis." *Id.* at 10. Sherbondy testified that there are "standards" of his profession "which apply to the use of income tax accounting", and are promulgated by the American Institute of CPAs, which is "the same institute that promulgates the GAAP procedures." *Id.* Sherbondy further explained that "on all of our doctors' offices that we do, we do not use an accrual basis of accounting" because there are "receivables that are booked in a medical practice and uncollected," and that the "gross billing figure [is] subject to adjustment with third party payers[.]" *Id.* at 16-17. Sherbondy explained, "[w]e wouldn't know the actual amounts collected from patients until some point later on in the year when … the insurance companies actually paid. So determining … an accurate accounts receivable figure" would prove difficult, especially "realizing the percentages … vary from pay to pay or insurers", and those adjustments "can be" … "significant in relation to gross billing." *Id.*

Sherbondy was asked to respond to Schaffner's "point that in … arriv[ing] at the $182,761 loss, [Sherbondy] failed to consider patient A[ccount] [R]eceivables at the front end of the period and at the back end of the period of [Appellant's] employment." *Id.* at 14. Sherbondy testified

- 30 -

that "again, these were financial statements prepared on the income tax basis of accounting, which does not consider accounts receivable[s]." *Id.*

By way of further explanation, the following testimony ensued:

GSA's Counsel: Now, with respect to the ongoing practice of medicine and in this practice or any other professional practice, is this an annual occurrence, there are receivables on the date you close on a cash basis and there are receivables on the date you open a year on a cash basis?

Sherbondy: Correct.

GSA's Counsel: What has been your experience with respect to the effect of those receivables by using a cash basis as opposed to an accrual that would pick up receivables?

Sherbondy: Well, in Dr. Kolenich's practice['s] case, [Appellant's] month-to-month income from his revenue from operations was fairly consistent, so adding receivables in at the beginning of the year or at the end of the year and then taking them out at the end of the year would have little to know [sic] effect on these statements.

*Id.* at 14-15.

To exemplify this analysis, Sherbondy testified that the "front end" of Appellant's employment period was the 2002 fiscal year spanning from October 1, 2001 through September 30, 2002. *Id.* at 15. Any "prior receivables [which] would roll in" at the beginning of the 2002 fiscal year would be receivables related only to Dr. Kolenich. *Id.* at 15. At the end of Appellant's employment, "there were two physicians … [and] accept[ing] for the moment that the Kolenich receivables at the beginning and at the end [of the employment term] would have been approximately the same as" Sherbondy had indicated in his report, then the "collections on the

receivables for services generated by [Appellant] subsequent to October 1, 2003", would have been "$14,474.93." *Id.* at 15-16.

Schaffner "also questioned [Sherbondy's] use of income tax depreciation as opposed to GAAP or financial depreciation." *Id.* at 17. In explaining the difference between these methods, Sherbondy testified:

> Well, GAAP would prescribe us using straight line or double declining balance, which would extend the depreciation over a longer period of time. We used income tax basis of accounting to aid Dr. Kolenich in his personal tax situation to reduce his tax liability. It's an accepted method of accounting.

*Id.* Sherbondy further testified that "we have used income tax basis of accounting for [GSA]" since 1990. *Id.* The "importance of consistency" is "[s]o that all of the statements are … comparable[.]" *Id.* at 18. Sherbondy uses the same accounting approach with "all of" the "other firms [Sherbondy] represent[s.]" *Id.*

Regarding the "leasehold improvement portion of the depreciation schedule," Sherbondy testified that there would be "no difference at all" between "the two forms of accounting" because "the leasehold improvements were depreciated over 39 years [and that] should be the same for GAAP." *Id.* at 18.

In considering the expert accounting testimony, the trial court, as the fact-finder, ultimately determined that it "f[ound] the testimony of GSA's accountant, [Sherbondy] to be credible, [and] well-documented[.]" Trial Court Opinion, 4/5/12, at 11. The trial court accepted Sherbondy's

"conclusions as stated in the findings [of fact] as fact and f[ound] that [Sherbondy's] cash basis accounting method [wa]s credible and acceptable for the purposes of this litigation." *Id.* I find no basis to disturb the trial court's determination regarding the evidence on which it chose to rely and credit. I recognize:

> [I]t is within the province of the [fact finder] to assess the worth of the testimony, which it may then accept or reject. We agree that the [fact finder] is free to believe all, some or none of the testimony presented by a witness. However, this rule is tempered by the requirement that the verdict must not be a product of passion, prejudice, partiality, or corruption, or must bear some reasonable relation to the loss suffered by the evidence [] as demonstrated by uncontroverted evidence presented at trial. The synthesis of these conflicting rules is that a [fact finder] is entitled to reject any and all evidence up until the point at which the verdict is so disproportionate to the uncontested evidence as to defy common sense and logic.

*Neison v. Heimes,* 653 A.2d 634, 636-37 (Pa. 1995) (internal citations omitted).

Based on my foregoing determinations, I would reach Appellant's fourth issue, and note that "(o)ur review of an award of pre-judgment interest is for abuse of discretion." *Kaiser v. Old Republic Insurance Co.*, 741 A.2d 748, 755 (Pa. Super. 1999) (citations omitted). An abuse of discretion exists where the trial court's determination overrides or misapplies the law, its judgment is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will. *See Majczyk v. Oesch,* 789 A.2d 717, 720 (Pa. Super. 2001). Appellant recognizes that pre-judgment interest may be awarded "where the damages are in the nature of consequential losses

arising from the breach of [a] contract." Appellant's Brief at 38. Appellant asserts that "the damages alleged by GSA are consequential damages." *Id.* at 39. Appellant maintains that "the subject contracts did not permit a calculation of the consequential damages that have been claimed by GSA of the specific dollar amount for these losses. Therefore, [Appellant] could not have ascertained the same by reference to the terms of the contracts and he could not have proffered any payment. Thus, it was improper to award pre-judgment interest under these circumstances." Appellant's Brief at 39. Again, I cannot agree.

We have explained:

> It is well established that in contract cases, prejudgment interest is awardable as of right. *Somerset Comm. Hospital v. Allan B. Mitchell & Assocs.,* 454 Pa.Super. 188, 685 A.2d 141 (1996) (citing *Thomas H. Ross Inc. v. Seigfreid,* 405 Pa.Super. 558, 592 A.2d 1353 (1991)). Our supreme court has held:
>
>> For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon contract is a legal right. *West Republic Mining Co. v. Jones and Laughlins,* 108 Pa. 55 (1884). That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment.
>
> *Fernandez v. Levin,* 519 Pa. 375, 548 A.2d 1191, 1193 (1988). Moreover, there is no requirement that the damages be liquidated and no exception to the right to prejudgment interest has been recognized simply because the amount of damages must be determined at trial. *Spang & Co. v. USX Corp.,* 599 A.2d at 984. *Cf. Daset Mining Corp. v. Industrial Fuels Corp.,* 326 Pa.Super. 14, 473 A.2d 584, 595 (1984) ("In claims that arise out of a contractual right, interest has been allowed at the legal rate from the date that payment was wrongfully withheld, where the damages are liquidated and certain, and the interest is readily ascertainable through computation.") The basic premise underlying the award of prejudgment interest to a party

centers on the fact that the breaching party has deprived the injured party of using interest accrued on money which was rightfully due and owing to the injured party. *Somerset Hospital*, 685 A.2d at 148.

**Widmer,** 837 A.2d at 469.

It is undisputed that prior to Appellant leaving GSA's employ, Dr. Kolenich sent Appellant a letter to "remind [Appellant] of the financial obligation [Appellant] ha[d] to UPMC/Horizon per [Appellant's] employment contract with [GSA]." Correspondence, 7/29/03, at 1. Dr. Kolenich specifically referred Appellant to "Item 15B in your employment contract with [GSA]," and advised Appellant that Dr. Kolenich was "presently asking for an update on that amount from [UPMC]." *Id.* Dr. Kolenich asserted that he would "provide [Appellant] with that information prior to [Appellant's] departure from [GSA]." *Id.* Likewise, it is undisputed that on October 15, 2003, UPMC Horizon issued a demand for payment of an amount certain to GSA, Dr. Kolenich, and Appellant. Correspondence, 10/15/03, at 1. Therefore, I cannot agree that some of the damages which GSA incurred were incalculable by reference to the contracts, such that the trial court erred in awarding pre-judgment interest. Further, "no exception to the right to pre-judgment interest has been recognized simply because the amount of damages must be determined at trial", such that the fact that further damages were calculated following the trial in this case does not preclude GSA's entitlement to pre-judgment interest. **Widmer, supra,** at 469.

Thus, I find that the trial court did not err or abuse its discretion in awarding pre-judgment interest.

I would likewise reach Appellant's fifth issue, where he challenges the trial court's interpretation of Pa.R.C.P. 227.4(1)(b). Appellant's fifth issue is "a question concerning [the] interpretation of [our] Rules [of civil procedure], … [and] is a question of law [regarding which] our standard of review is *de novo.*" **LaRue v. McGuire,** 885 A.2d 549, 553 (Pa. Super. 2005). Upon review, I find that Appellant is not entitled to relief. Appellant filed his initial post-trial motion on October 29, 2013. Pursuant to Pa.R.C.P. 227.4(1)(b), GSA was entitled to praecipe for judgment in its favor after February 26, 2014, after 120 days had elapsed. **Crystal Lake Camps v. Alford**, 923 A.2d 482, 486 (Pa. Super. 2007). GSA praeciped for the entry of judgment on April 7, 2014. The trial court correctly acknowledged that it lacked the authority to decide Appellant's post-trial motions after GSA had praeciped for judgment pursuant to Pa.R.C.P. 227.4(1)(b). **See Pentarek v. Christy,** 854 A.2d 970, 972-974 (Pa. Super. 2004) **vacated on other grounds,** 974 A.2d 1160 (Pa. 2005) (reversing a trial court's grant of a new trial after a judgment was recorded pursuant to Pa.R.C.P. 227.4(1)(b) because the trial court's order was "entirely devoid of legal effect"); **see also Pittsburgh Construction Co. v. Griffith,** 834 A.2d 572, 592-593 (Pa. Super. 2004) (reversing a trial court's order striking the judgment entered pursuant to Pa.R.C.P. 227.4(1)(b), noting that "[t]here is no list of exceptions to [the rule]); **Conte v. Hahnemann University Hospital,** 707

A.2d 230, 231 (Pa. Super. 1998) (a judgment entered pursuant to Pa.R.C.P. 227.4(1)(b) "is not subject to either reconsideration or any other motion to strike, open, or vacate"). Therefore, I find that Appellant's fifth issue is without merit.

In sum, following my careful scrutiny of Appellant's issues, the record, and applicable legal authority, I dissent based on my conclusion that Appellant's claims of trial court error lack merit.